*In re* J.W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.W., Respondent-Appellant).

First District (1st Division)   No. 1—01—2703

Opinion filed February 9, 2004.

Michael J. Pelletier and Sarah Curry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan Spellberg, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

J.W. was prosecuted under the "extended jurisdiction juvenile prosecutions" provision of the Juvenile Court Act of 1987 (705 ILCS 405/5—810 (West 2000)) (EJJ statute) for the stabbing of her mother. A jury convicted her of first degree murder (720 ILCS 5/9—1(a) (West 2000)). The court sentenced her to juvenile detention for a minimum of five years as required under section 5—750(2) of the Juvenile Court Act of 1987 (705 ILCS 405/5—750(2) (West 2000)) and the EJJ statute (705 ILCS 405/5—810(4)(i) (West 2000)). It further sentenced her to an adult sentence of 35 years' imprisonment (730 ILCS 5/5—8—1(a)(1) (West 2000)), which sentence was stayed pursuant to the EJJ statute (705 ILCS 405/5—810(4)(ii) (West 2000)).

At trial, the evidence showed that the victim, Ms. Walters, who was J.W.'s mother, and her boyfriend Christopher Morris had lived together for five years. In late August 2000, they moved from their one-bedroom apartment into a two-bedroom apartment in the same complex at 1931 Prairie Square, Schaumburg, Illinois, so that J.W., who was 13 years old at the time, could live with them. J.W. had previously lived with Ms. Walters' grandmother in Chicago. Ms. Walters pressured J.W. to move to Schaumburg because she was concerned that J.W.'s friends were a negative influence on her and that J.W. was going to get pregnant while she was young. J.W. did not want to move in with her mother, but she felt she had no choice. She moved to Schaumburg on Monday, August 28, 2000.

Her first day there, J.W. made an entry in her diary about killing her mother with a knife. She wrote the following, striking out certain portions:

"go and hide in the hall stab her in the back intill [sic] she dies come back in the house and call grandma. tell her my mom said she was going out to the car to get something that was like 20 minutes ago. I'm going to see where she's ate because she asked me to clean my glass mirror off but I don't see the windex leave out Oh ma ma-ma Dead grandma. Help somebody knock on someones door help my mom's has got stabed. Oh let me go get my folder out of her trunk while she's out their [sic] I'm about to she [sic] where she is Oh grandmama mama has got [illegible word] layene [sic] on the floor dead."

During the rest of the week, J.W. described that Ms. Walters "would wake up mad all the time" and "holler at [J.W.] for no reason." She explained:

"And she'd get mad about the dishes and I don't even know how to cut the dishwasher on. And then she get [*sic*] mad about my clothes and ask me why I can't be like other people, about something with some shirts. And just wanted me to be and dress like somebody I can't be."

Ms. Walters did not hit J.W. during the week they lived together.

On Friday, September 1, 2000, J.W. took a knife from the kitchen and put it inside her black purse. That day she thought about using the knife to kill her mother in the hallway, but she "didn't have the guts."

That night Ms. Walters' young cousins, nine-year-old Asia Ashley and eight-year-old Devonte Taylor,[1] spent the night at Ms. Walters' apartment. Ashley slept with J.W. in her unfurnished bedroom that night. On Saturday morning, September 2, 2000, Ashley and Taylor watched television until J.W. awoke and fed them. According to J.W., her mother got up around 1 p.m. "with a [*sic*] attitude" and started "hollering" at J.W. about breakfast for Ashley and Taylor. The lights went out in the apartment, and Ms. Walters called someone to fix the problem. Ms. Walters showered and dressed for a medical appointment. Meanwhile, J.W. took the knife from her black purse and put it in the back of her pants.

After she was dressed and ready, Ms. Walters went out to her Nissan Altima in the parking lot. Ms. Walters called back to the house for her sunglasses. J.W., who had been playing in her room with Ashley and Taylor, went outside. Ashley thought she heard J.W. slide something off of a table before going outside.

J.W. was having second thoughts about stabbing her mother when she came outside, but she knew her mother "was gonna holler if [J.W.] wouldn't of said nothing and came downstairs." J.W. approached the driver's side of her mother's car and knocked on the door. Ms. Walters "had a [*sic*] attitude and she was just like, what, what." J.W. opened the door and began stabbing her mother, first in the head, then in the arm. J.W. and Ms. Walters struggled. J.W. asked Ms. Walters if she loved Morris more than she loved J.W. and J.W.'s brother, Edward. Ms. Walters did not answer the question. She told J.W. to "stop."

At one point, Ms. Walters got the knife away from J.W. and stabbed J.W. in the hand. Ms. Walters, who was lying with her head near the

---

[1]Although Devonte is spelled Devonte, Devante, and Devontae in the record, the parties refer to Devonte in their briefs.

passenger's door, opened the door and dropped the knife to the ground. J.W. went around the car and picked up the knife. Ms. Walters pulled J.W.'s hair. J.W. stabbed her mother more, eventually stabbing her in the stomach, where the knife got stuck. Ms. Walters was lying on the floor, underneath the dashboard, gasping for air—breathing "[l]ike she had asthma." Ms. Walters scratched J.W. on the neck and said "lord, let me die. And if you want to kill me, you need a bigger knife."

Fanlam Jing, a resident of 1931 Prairie Square, was in her car in the parking lot at approximately 3 p.m. on September 2, 2000. She noticed another car parked on her left-hand side, about two spaces away. A person was seated in the passenger's side. Her first impression was that the person was a young male with short dark hair. However, she could only see the person's head and was not sure whether her first impression was correct. She heard a slight noise and felt "a little uncomfortable and perhaps a little uneasy" when she noticed the person in the car.

J.W. was out of the apartment for 15 to 20 minutes before Ashley and Taylor noticed her absence. They looked through the apartment for her, and when they were unable to find her, they stepped out onto the apartment's balcony. They saw Ms. Walters and J.W. inside Ms. Walters' car. The two appeared to be wrestling. Ashley and Taylor threw berries at Ms. Walters' car to try to get J.W.'s attention. About the same time, two boys, Mike and Evan Harris, rode by on bicycles. J.W. got out of the car and yelled that someone had stabbed her mother. Ashley and Taylor called 911.

J.W. went back into the apartment. She made two calls and washed her hands and her face, which had blood "all over" them. She changed out of her white capri pants, which also had blood on them. She went into the kitchen and got a bread knife, which she took outside to the car. Ms. Walters was still lying on the floor, gasping for air. Her eyes were open and her fists balled up. J.W. climbed into the car and tried to stab her mother some more. Because the knife was not penetrating well, J.W. used the knife to cut her mother, rather than to stab her.

Ms. Walters was still breathing when J.W. decided to go back upstairs. J.W. put the bread knife inside a black garbage bag with her clothes. J.W. then took a third knife, a steak knife, from the apartment. When her cousins saw her getting the knife from the kitchen, she told them that she was "gonna [sic] kill whoever stabbed [her] mother." J.W. took the steak knife out to the car where her mother was lying, still in the same position, still gasping for air. J.W. stabbed her mother "a little" with the third knife "from her thighs on up." Ms. Walters was still gasping for air but "a little slower." J.W. began crying and then went back upstairs and threw the knife in the kitchen.

One of her cousins picked up the knife and threw it in the garbage can.

At 3:57 p.m., the Schaumburg police and fire departments received a call regarding a stabbing at Walden Woods Apartments, at 1931 Prairie Square. Paramedics Steven Lafin and Eric Marto arrived at the scene and were directed by two boys on bicycles to a car in the parking lot. Lafin looked inside the car and saw "an African-American female with her upper body, her head and chest on the passenger's side with her head down towards the floor on the passenger's side with her feet up on the driver's side seat." Officer Mike Carroll, a Schaumburg police officer, who arrived at about the same time, "observed the female [occupant] slumped over from driver side into the passenger seat near the floor board area passenger seat of the vehicle." There were large amounts of blood in the interior of the car, and some had leaked from the car onto the ground. A black handle was protruding from Ms. Walters' abdomen.

The paramedics removed Ms. Walters from the car. She was still breathing, but she had no pulse. She had "multiple lacerations and stab wounds to the throat, the chest area, the left forearm had multiple lacerations to the front side of her forearm, both hands had stab wounds." At one point, her heart stopped, but the paramedics were able to get her heart beating again. They transported Ms. Walters to Northwest Community Hospital, where she was treated by Dr. Robert Rao.

When Rao, a general and trauma surgeon, first encountered Ms. Walters in the emergency room at Northwest Community Hospital, she had no vital signs and "was dead or very close to dead."

> "[S]he had multiple stab wounds, especially in the arms. Her arms looked sort of like hamburger. *** With large amounts of blood coming out of both arms. She had multiple little stab wounds to the chest and abdomen. And there was a large knife sticking out of her abdomen or the handle sticking out of the abdomen. And she had a tube in her neck, a tracheostomy tube that was breathing for her."

Rao and other doctors were able to get Ms. Walters' pulse back and her heart beating again, but only for about 10 minutes. Ms. Walters was pronounced dead at 5:34 p.m. At some point, Rao removed the knife from Ms. Walters' abdomen. He did not suffer any cuts while doing so.

In the parking lot at 1931 Prairie Square, Carroll noticed three children nearby. One of them was J.W.; she was crying. "[H]er shirt had blood on it," front and back. She also had cuts on her hands. She told Carroll and Schaumburg police detective Vince Liberio that she

did not know who had hurt her mother. She said "she had seen a female—female teenager approximately 14 years of age running westbound from the area of the vehicle when she had returned from the apartment to retrieve sunglasses for her mother." J.W. requested to use the restroom, and Carroll took her into the apartment.

Inside the apartment, J.W. led Carroll to a hallway bathroom, where, "on the tile floor[,] there were what appeared to be diluted blood droplets on the tile floor." Carroll did not allow J.W. to enter that bathroom; instead, J.W. used the bathroom adjacent to the master bedroom. Carroll did a cursory search of the rest of the apartment and "observed an open garbage can basket *** on the kitchen floor," on top of which a bloody knife was lying. While in the apartment, J.W. removed the bread knife from the black garbage bag in her bedroom and put it in the pillow case of her pillow. Carroll and J.W. left the apartment, and the apartment was sealed off.

At approximately 4:30 p.m., on September 2, 2000, Karen Brzezicki, a paramedic with the Schaumburg fire department, arrived at the scene in a second ambulance. Brzezicki examined J.W. and noticed "lacerations on her right hand down the center of her palm. On her left hand she had another laceration toward the outside of her hand *** by her small finger. She also had minor lacerations to her face toward *** her chin area." Additionally, J.W. had an abrasion on her left arm. Brzezicki and her partner bandaged J.W.'s hands. Carroll rode inside the ambulance with J.W. while she was transported to Alexian Brother's Medical Center for treatment of her hands.

At the hospital, Hope Carroll, the triage nurse, did not notice any abrasions or lacerations on J.W.'s face. J.W. received seven stitches in her left hand and three stitches in her right hand. Schaumburg youth officer Mike Degiulio went to Alexian Brothers Medical Center to meet with J.W., who "was the number one witness to this crime." He took limited custody of her because she had no family present. J.W. told Degiulio that she did not know who had hurt her mother. Degiulio took J.W. to the Schaumburg police department where she remained until her maternal relatives arrived at approximately 11:30 p.m. That night J.W. stayed at her maternal great-grandmother's house in Chicago.

Morris, who had been in Crystal Lake, Illinois, for a softball game and a barbecue on September 2, 2000, went to the Schaumburg police department immediately upon receiving a message from the police that evening. He was informed that Ms. Walters had been killed. He consented to a search of his vehicle and his apartment.

On September 3, 2000, Thamrong Chira, a forensic pathologist with the Cook County medical examiner's office, performed the

autopsy on Ms. Walters. Chira noticed "123 incise and puncture wounds and two of the abrasion wound [*sic*]" and 87 stab wounds. Ms. Walters had defensive wounds on her hands, arms, and legs. The wounds were consistent with the knife that was recovered from Ms. Walters' abdomen and the two that were recovered from her apartment. Chira opined that it was possible that the wounds were inflicted by "a 13 year old girl approximately 5 [feet] tall, 100 pounds." Chira determined the cause of death to be "multiple stab and incise wounds" and the manner of death to be "homicide."

In the afternoon on September 3, 2000, J.W. and her brother, Edward, were brought to the Schaumburg police department. J.W. was given food. Then, she was interviewed by Liberio and Degiulio. Again, she told them that she did not know who stabbed her mother. They took her outside to the parking lot, and she demonstrated how she found her mother.

Morris again consented to the search of his apartment, and at 3:40 p.m., Schaumburg Detectives Czerniak and Somski went to the apartment to "look for anything that may be related to the homicide." They found "a small knife" in the dishwasher. They found "a larger bread type knife" that appeared to have blood on it inside a pillow case in J.W.'s bedroom. Czerniak also discovered J.W.'s diary inside her bedroom closet. Czerniak contacted Liberio about what had been found in the apartment. The items were brought to the police department.

Some of J.W.'s maternal family members were contacted and arrived at the police department between 9 and 9:30 p.m. At approximately the same time, Assistant State's Attorney Mary Beth Kinnerk arrived. She met with J.W. and told J.W. that she was a prosecutor and was not J.W.'s attorney. She "Mirandized" J.W. by reading each of the *Miranda* rights and having J.W. explain what each meant. She further explained to J.W. that she could be tried as an adult for the murder of her mother. J.W. indicated that she understood her rights and that she could be tried as an adult. She signed a waiver of rights.

Kinnerk asked J.W. if she wanted to see her maternal relatives. When J.W. said she did not want to see those relatives, Kinnerk asked whether there were any relatives she wanted to see. J.W. said she would like to see Jerilene Mitchell, whom she called Aunt Babs; her father, Gilbert Mitchell; or her paternal grandmother, Arlene Mitchell.

J.W.'s father was contacted by telephone. He gave permission for continued conversations with J.W. After arrangements were made for police cars to pick up Jerilene and Gilbert Mitchell, Kinnerk asked J.W. if she wanted to continue talking or if she wanted to wait for one of her paternal relatives to arrive before continuing the conversation. J.W. said she would continue speaking with Kinnerk. At that time, J.W.

confessed to stabbing her mother. Kinnerk asked J.W. whether she would be willing to make the statement again so that it could be videotaped. J.W. said she would.

Between 12:30 and 1 a.m., Jerilene Mitchell arrived at the police department. J.W.'s father did not come to the police department. When he was told that Jerilene Mitchell was on her way to the police department, Gilbert Mitchell said he did not need to be there as well. Jerilene Mitchell spoke with Kinnerk, Liberio, and Degiulio, who informed her that J.W. had agreed to give a videotaped statement. Jerilene Mitchell was allowed to see J.W. Timothy Bennett, a shorthand reporter and videographer, saw Jerilene Mitchell and J.W. together while he prepared the video equipment. He did not hear whether they were saying anything, but he saw their mouths moving.

At about 2:30 a.m., Bennett began taping J.W.'s statement. J.W., Kinnerk, Degiulio, and Jerilene Mitchell were in the room and are visible on the videotape. Only Kinnerk and J.W. spoke during the taping. Kinnerk first reviewed J.W.'s rights with her. Then, J.W. again confessed to killing her mother.

Several days later, on September 7, 2000, Morris consented to another search of his apartment. He also went to the apartment that day and saw that three knives were missing from the apartment. They were the three knives that J.W. had used in stabbing her mother.

At trial, the State's evidence consisted of a significant amount of physical evidence, including photographs of the car after Ms. Walters' body was removed, photographs of "reddish stains [found] on the wall and floor" inside the apartment, photographs of the victim, the three knives that J.W. used to stab her mother, the diary, J.W.'s bloodstained clothes, and various items recovered from inside and around the car. The State also played a videotape of the crime scene and a videotape of J.W.'s confession for the jury.

J.W.'s palm prints were found on the door of Ms. Walters' car and her fingerprints on one of the knives she used in the stabbing. Her blood was found on a black garbage bag, the bread knife, and one of the kitchen drawers in the apartment. J.W. could not be excluded as a contributor to bloodstains on one of the car's door handles and on the steak knife. Morris's DNA was not found on any of the items tested by the crime lab.

Jean S. Brundage, a document examiner with the Illinois State Police Crime Lab, compared the handwriting on the diary page that described the killing with a writing exemplar given by J.W. Brundage's "findings were inconclusive." She "found isolated similarities as well as discrepancies between the known and the questioned writing[;] the absence of directly comparable repititions [sic] as well as the wide

10

rang [*sic*] of variations within the questioned writing preclude[s] a definite conclusion." Brundage requested another writing exemplar. Her examination was still inconclusive. She noted, however, that the samples "were more carefully written than what the questioned writing was. *** [I]t [*sic*] was with more control. There wasn't as much variation as far as the slant, the size or the formation of some of the letters." A request for additional writing exemplars went unanswered.

At the close of all of the evidence, the jury found J.W. guilty of first degree murder. After a sentencing hearing, the trial judge sentenced J.W. to juvenile detention. He also imposed a 35-year adult sentence, which was stayed pursuant to the EJJ statute (705 ILCS 405/5—810(4)(ii) (West 2000)).

J.W. argues that the EJJ statute is unconstitutional because it undermines the right to a jury trial "by insulating some factual issues from the jury, and because it fails to apply the reasonable doubt standard, where constitutionally, it must be applied." Specifically, J.W. complains that the EJJ statute, like the statute declared unconstitutional in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), allows for an enhancement of penalty based on a fact that should be decided by a jury beyond a reasonable doubt. That fact is whether the case qualifies for prosecution under the EJJ statute.

In response, the State contends that the EJJ statute does not violate *Apprendi* because it is not an enhancement provision. The State urges us to follow *In re Matthew M.*, 335 Ill. App. 3d 276 (2002), in which the Second District Appellate Court found that the EJJ statute does not violate *Apprendi*. J.W. replies that *Matthew M.* was incorrectly decided.

In *Apprendi*, the Supreme Court considered the constitutionality of a New Jersey statute that allowed the sentence of a defendant convicted of a second degree offense to be enhanced beyond that usually allowed for a second degree offense based on a judge's finding that the " 'defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " *Apprendi*, 530 U.S. at 468-69, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351, quoting N.J. Stat. Ann. § 2C:44—3(e) (West Supp. 1999-2000). It found that the New Jersey statute was "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system" because it allowed a defendant to be sentenced in excess of what was authorized by the jury's verdict. *Apprendi*, 530 U.S. at 497, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366. The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

In the only case considering the constitutionality of the EJJ statute in light of *Apprendi*, the Second District Appellate Court held that the EJJ statute was not unconstitutional under *Apprendi* "[b]ecause the trial court's determination to designate a proceeding as an EJJ prosecution does not adjudicate the minor's guilt." *Matthew M.*, 335 Ill. App. 3d at 289. Importantly, the court noted that "[a]lthough \*\*\* in designating a proceeding as an EJJ prosecution, the trial court may make findings that expose [respondent] to a greater sanction, he has no due process right to have a jury make those findings." *Matthew M.*, 335 Ill. App. 3d at 289. The court explained: "As a minor respondent has no constitutional right to be prosecuted through the juvenile court system, the legislature's decision to require the imposition of a conditional adult sentence in certain instances does not result in a constitutional deprivation of due process." *Matthew M.*, 335 Ill. App. 3d at 290.

■ We agree with the court in *Matthew M.*, that *Apprendi* is not applicable under the circumstances of this case. As a general rule, minors do not have the right to a jury trial in delinquency cases. See 705 ILCS 405/5—101(3) (West 2000) ("Minors shall not have the right to a jury trial unless specifically provided by this Article"); see also *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 29 L. Ed. 2d 647, 661, 91 S. Ct. 1976, 1986 (1971) (plurality op.) ("[W]e conclude that trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement"); *In re A.G.*, 195 Ill. 2d 313, 318-19 (2001) (while other procedural rights of adults in criminal proceedings apply in juvenile cases, the right to a jury trial does not). Moreover, a juvenile does not have a constitutional right to a juvenile adjudication and juvenile sentence in lieu of a criminal prosecution and adult sentence. See *People v. P.H.*, 145 Ill. 2d 209, 223 (1991) ("[J]uveniles have neither a common law nor a constitutional right to adjudication under the Juvenile Court Act"). Our courts have applied similar reasoning in holding that transfer provisions, which also subject juveniles to adult sentences, are not unconstitutional under *Apprendi*. See *People v. Beltran*, 327 Ill. App. 3d 685, 690-91 (2002); *People v. Beck*, 339 Ill. App. 3d 413, 418 (2003). We find no reason to depart from this reasoning.

Moreover, unlike the statute in *Apprendi*, the EJJ determination does not increase the allowable penalty for murder based upon a judge's independent finding with regard to additional elements of the crime. J.W. was convicted of first degree murder, which requires proof that a person killed another without lawful justification and that

"in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9—1(a) (West 2000).

If the State succeeds in proving these elements beyond a reasonable doubt, the judge has discretion in sentencing the offender to 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(b) (West 2000). In this case, the jury found that the State proved each of these required elements beyond a reasonable doubt. J.W. does not contest the sufficiency of the evidence. The EJJ statute does not modify or change the elements of first degree murder in any way. See 705 ILCS 405/5—810 (West 2000). Thus, the EJJ statute does not violate J.W.'s due process rights under *Apprendi*.

J.W. next contends that the EJJ statute is unconstitutionally vague because it "does not provide a juvenile with proper notice as to what actions by the minor will result in a violation of the minor's juvenile sentence" and it does not "provide a judge with any guidance or standards for determining when a violation of the conditions of the juvenile sentence should result in the imposition of the adult sentence." Particularly, J.W. complains of the statute's failure to define the "conditions" of the juvenile sentence and the term "offense."

The State first contends that J.W. has no standing to contest the constitutionality of this provision because her "claimed injury derives from her challenge to the provisions contained in the EJJ [statute] which detail when an adult sentence will be served. Respondent has yet to suffer any injury, however, because she has yet to have her adult sentence imposed and may never have that adult sentence imposed." Regardless, the State contends, the statute is not vague. It claims that use of the term "offense" means criminal offense, and "[t]o assume or argue otherwise is absurd." The State also argues that the term "conditions" is not vague because "it is evident that the *juvenile court*—in individual cases—actually imposes the 'conditions of the juvenile sentence.' " (Emphasis in original.)

The provision at issue provides:

"When it appears that a minor convicted in an extended jurisdiction juvenile prosecution under subsection (1) has violated the conditions of his or her sentence, or is alleged to have committed a new offense upon the filing of a petition to revoke the stay, the court may, without notice, issue a warrant for the arrest of the

minor. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a new offense, the court shall order execution of the previously imposed adult criminal sentence. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a violation of his or her sentence other than by a new offense, the court may order execution of the previously imposed adult criminal sentence or may continue him or her on the existing juvenile sentence with or without modifying or enlarging the conditions. Upon revocation of the stay of the adult criminal sentence and imposition of that sentence, the minor's extended jurisdiction juvenile status shall be terminated. The on-going jurisdiction over the minor's case shall be assumed by the adult criminal court and juvenile court jurisdiction shall be terminated and a report of the imposition of the adult sentence shall be sent to the Department of State Police." 705 ILCS 405/5—810(6) (West 2000).

█ "The general rule is that courts will not consider the validity of a statutory provision unless the person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid." *People v. Morgan*, 203 Ill. 2d 470, 482 (2003). Our inquiries into the constitutionality of statutes are limited to the extent required by the particular case, and we will not formulate a rule broader than necessitated by the circumstances of that case. See *P.H.*, 145 Ill. 2d at 223 (holding that "gang-transfer" statute was constitutional). Thus, we first consider whether J.W. has standing to challenge the constitutionality of the revocation of stay provision of the EJJ statute.

█ "The doctrine of standing is intended to insure that issues are raised and argued only by those parties with a real interest in the outcome of the controversy." *People v. Greco*, 204 Ill. 2d 400, 409 (2003). It requires that the person has suffered or is in immediate danger of suffering a direct injury as a result of enforcement of the challenged statute. See *Greco*, 204 Ill. 2d at 409. Standing is determined on "a case-by-case basis." *Greco*, 204 Ill. 2d at 409.

In this case, the trial court sentenced J.W. to a juvenile sentence and an adult sentence; however, it stayed her adult sentence pursuant to the EJJ statute. See 705 ILCS 405/5—810(4)(ii) (West 2000). The portion of the EJJ statute that J.W. challenges provides for the revocation of the stay and the execution of the adult sentence. See 705 ILCS 405/5—810(6) (West 2000). She directs us to a case from the Supreme Court of Montana in support of her standing.

In *In re S.L.M.*, 287 Mont. 23, 30, 951 P.2d 1365, 1369 (1997), the Supreme Court of Montana considered a number of constitutional challenges to its Extended Jurisdiction Prosecution Act, which

provides that under certain circumstances juvenile offenders may be sentenced to a juvenile sentence and an adult sentence, which is stayed " 'on the condition that the youth not violate the provisions of the disposition order and not commit a new offense.' " *S.L.M.*, 287 Mont. at 30, 951 P.2d at 1369, quoting Mont. Code Ann. § 41—5—1604(1)(b) (1995). Five juveniles contested the constitutionality of the statute, claiming that it violated "equal protection by subjecting them to a longer period of incarceration than that permitted for an adult offender." *S.L.M.*, 287 Mont. at 31, 951 P.2d at 1370. The court found that the juveniles had standing to contest the constitutionality of their adult sentences. *S.L.M.*, 287 Mont. at 31, 951 P.2d at 1370. In that case, however, adult sentences had been executed against three of the five juveniles who had violated the provisions of their disposition orders or had committed a new offense. *S.L.M.*, 287 Mont. at 26-28, 951 P.2d at 1367-68. Moreover, at issue in that case was whether imposition of the sentence, rather than execution of it, violated the juveniles' equal protection rights.

■ In this case, J.W.'s sentence has been imposed and she does not contest the constitutionality of imposition of the sentence on equal protection grounds as in *S.L.M.* Nor does she contest imposition of the sentence on vagueness grounds. Instead she contests revocation of the stay on vagueness grounds. However, under the law in this state, her claim is premature and we will not consider it.

In *People v. Wills*, 61 Ill. 2d 105, 108 (1975), the supreme court reviewed an appellate court decision, which held that section 5—8—1(e) and a portion of section 3—3—9(a)(3)(i) of the Unified Code of Corrections (now see 730 ILCS 5/3—3—9(a)(3)(i), 5—8—1(e) (West 2000)) were unconstitutional because their terms provided that "in the event of revocation of [a mandatory] parole, a defendant could be incarcerated for periods which in the aggregate exceeded the maximum of the indeterminate sentence imposed by the [circuit] court." *Wills*, 61 Ill. 2d at 109. The supreme court reversed that portion of the appellate court's holding, finding that the constitutionality of the provisions was not properly before the court because the defendant was not eligible for parole at the time and, consequently, "there [was] no basis for application of the statutory provisions which the appellate court held invalid." *Wills*, 61 Ill. 2d at 109.

In *People v. Mengedoht*, 31 Ill. App. 3d 1084, 1086 (1975), the court considered the same mandatory parole provision and similarly recognized that where the defendant was not yet eligible for parole, "the situation had not developed to the point of parole and no injury had yet occurred."

In *People v. Therriault*, 42 Ill. App. 3d 876, 890 (1976), the court

also considered a mandatory parole provision and similarly concluded that the defendant's constitutional claim was not properly before the court because "the constitutionality of the statute in question [would not be] ripe for decision until parole [had] actually been revoked." Likewise, in this case, J.W.'s claim is premature until a petition to revoke the stay is filed in accordance with the EJJ statute. 705 ILCS 405/8—810(6) (West 2000).

J.W. next argues that even if the EJJ statute is constitutional, the trial court erred in designating her proceeding as an EJJ prosecution because J.W. was only 13 years old at the time of the offense and had no history of delinquency. The State responds that the trial court appropriately considered and weighed all relevant factors and that it was not an abuse of discretion for the court to designate these proceedings as an EJJ prosecution.

■ The EJJ statute provides that upon a petition by the State, alleging that the minor committed a crime when she was 13 years of age or older that would have been a felony if committed by an adult, if the trial court determines there is probable cause to believe the allegations, "there is a rebuttable presumption that the proceeding shall be designated as an extended jurisdiction juvenile proceeding," and

"[t]he judge shall enter an order designating the proceeding as an extended jurisdiction juvenile proceeding unless the judge makes a finding based on clear and convincing evidence that sentencing under the Chapter V of the Unified Code of Corrections would not be appropriate for the minor based on an evaluation of the following factors:

(i) The seriousness of the alleged offense;

(ii) The minor's history of delinquency;

(iii) The age of the minor;

(iv) The culpability of the minor in committing the alleged offense;

(v) Whether the offense was committed in an aggressive or premeditated manner;

(vi) Whether the minor used or possessed a deadly weapon when committing the alleged offense.

In considering these factors, the court shall give greater weight to the seriousness of the alleged offense and the minor's prior record of delinquency than to other factors listed in this subsection." 705 ILCS 405/5—810(b) (West 2000).

At the hearing on the State's petition for an EJJ prosecution, the parties stipulated that J.W. was 13 years old at the time of the offense and that the alleged offense, murder, would be a felony if committed by an adult. Degiulio testified that the victim was alive at the scene of the stabbing on September 2, 2000, but was pronounced dead at

Northwest Community Hospital at 5:34 p.m. the same day. The victim died of multiple stab and incise wounds, nearly 200 such wounds. On September 4, 2003, at 2:38 a.m., J.W. implicated herself in her mother's death.

> "She indicated that she had stabbed and caused the death of her mother. It was also indicated that prior to this, she had placed some writings in a diary that had indicated her intent or plan, and this plan was ultimately carried out to stab and kill her mother."

J.W. used a deadly weapon. In fact, she used three knives in the course of stabbing her mother. Degiulio also stated that J.W. had no prior record of delinquency. On cross-examination, Degiulio stated that handwriting exemplars obtained from J.W. were inconclusively compared with the handwriting in the diary. He also admitted knowing that there were fingerprints found in the car that did not belong to J.W. or to the victim. However, J.W.'s fingerprints were on at least one of the knives.

The defense offered the statement of Ashley as it was recorded by Assistant State's Attorney Lawrence M. Lykowski on September 12, 2000, at 4:50 p.m. Ashley, a fourth grader, reported that she was at the victim's house on Saturday, September 2, 2000. At one point, the victim left the house wearing a denim shirt and a hat. The victim then called "up to [J.W.] and asked her to bring down her sunglasses." Ashley heard J.W. "grab something from the table." Then, she heard the door close as J.W. went outside. Twenty minutes later, Ashley could not find J.W. so she went out on the balcony. She saw the victim's car.

> "[S]he looked through the rear window and could see into [Ms. Walters'] car. *** [S]he saw [J.W.] in the front driver's seat of the car, and she could see that [Ms. Walters] was in the front passenger area. *** [I]t looked like [Ms. Walters] and [J.W.] were wrestling. It looked like they were rolling around."

At some point, J.W. noticed Ashley and Taylor standing on the balcony. She yelled to them that somebody had killed her mother. Ashley called 911 at that time. J.W. came back into the house "and got a knife from the block on the counter." J.W. said, " 'I am going to kill whoever killed my mother.' " J.W. made a telephone call and washed her hands "because she had cuts on her hands."

The trial court granted the State's motion and designated the proceedings as an EJJ prosecution. The court considered "the seriousness of the alleged offense, the crime of murder. That the minor does, in fact, have no history of delinquency. That the minor was at the young age of 13 years old." The court also considered J.W.'s confession, that she committed the crime alone, and that there was evidence that the crime was premeditated.

Admitting that no cases have analyzed a court's decision to designate a proceeding as an EJJ prosecution, J.W. relies on a case interpreting the juvenile transfer statute in support of her argument that the trial court's EJJ designation was improper because she was only 13 at the time she committed the crime and had no history of delinquency. In *People v. Clark*, 119 Ill. 2d 1, 5 (1987), the minor was charged with intentional murder, knowing murder, and felony murder in each of two deaths, along with two counts of home invasion, two counts of residential burglary, two counts of robbery, and one count of aggravated criminal sexual assault. Upon the State's petition, the case was transferred to criminal court. *Clark*, 119 Ill. 2d at 4. Ultimately, the minor was found guilty on all counts. *Clark*, 119 Ill. 2d at 6. On appeal, the minor contested the adequacy of the transfer hearing, specifically on the grounds that "(1) no consideration was given to whether or not his best interests or the best interests of society necessitated that he be imprisoned for the remainder of his life [as required upon conviction of two counts of intentional murder] and (2) no consideration was given to his social and personal history, particularly as this bears on his rehabilitative potential." *Clark*, 119 Ill. 2d at 6-7.

The court recognized that "[w]here the juvenile judge considers evidence on the various statutory factors and evidence on any other relevant matters as provided in [the transfer statute], the resulting decision is a product of sound judicial discretion which will not be disturbed on review." *Clark*, 119 Ill. 2d at 14. However, the court found that the juvenile judge did not "consider whether or not imprisonment of the defendant for the duration of his natural life was in his best interests or was required for the security of society" as necessitated under the transfer statute. *Clark*, 119 Ill. 2d at 16. Thus, the court held that the transfer hearing was inadequate. *Clark*, 119 Ill. 2d at 16. As an alternative ground for finding the hearing inadequate, the court found that the trial court failed "to investigate the history of the defendant, especially as it related to his potential for rehabilitation." *Clark*, 119 Ill. 2d at 16.

■ In this case, there is no evidence that the trial court failed to consider J.W.'s age or her lack of previous delinquency. In fact, the court's ruling affirmatively states that it considered both factors along with the other relevant statutory factors. One of the factors that the EJJ statute allows the juvenile court to give greater weight to is the "seriousness of the alleged offense." The trial court did so in this case. Accordingly, its decision "is a product of sound judicial discretion which will not be disturbed on review." *Clark*, 119 Ill. 2d at 14; see also *People v. D.B.*, 202 Ill. App. 3d 194, 200 (1990).

■ Finally, J.W. argues that the dispositional order and the mit-

timus should be amended to reflect conviction of only one count of first degree murder. The State agrees, and we do as well. "A defendant cannot be convicted of more than one murder arising out of the same physical act." *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990) (vacating four of six murder convictions because only two homicides occurred). In this case, there was but one homicide, yet both the dispositional order and the mittimus reflect convictions for first degree murder under sections 9—1(a)(2) and 9—1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1), (a)(2) (West 2000)). "When multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated." *Pitsonbarger*, 142 Ill. 2d at 377. Thus, the dispositional order and the mittimus should be amended to reflect only one conviction for murder under section 9—1(a)(1) of the Criminal Code (720 ILCS 5/9—1(a)(1) (West 2000)).

For the foregoing reasons, we affirm J.W.'s conviction for first degree murder under section 9—1(a)(1) of the Criminal Code (720 ILCS 5/9—1(a)(1) (West 2000)) and her sentence under the EJJ statute (705 ILCS 405/5—810 (West 2000)). We order that the dispositional order and the mittimus be amended to reflect only one conviction for first degree murder under section 9—1(a)(1) of the Criminal Code (720 ILCS 5/9—1(a)(1) (West 2000)).

Affirmed as amended.

O'MALLEY, P.J., and GORDON, J., concur.