(No. 42368.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* WILLIAM BURRIS, Appellant.

*Opinion filed June 24, 1971.—Rehearing denied October 4, 1971.*

GERALD W. GETTY, Public Defender, of Chicago, (MICHAEL WEININGER, JAMES N. GRAMENOS and JAMES J. DOHERTY, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago,

(JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and PAUL P. BIEBEL, JR., Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE RYAN delivered the opinion of the court:

After a jury trial in the circuit court of Cook County the defendant was convicted of murder and was sentenced to from 25 to 40 years in the state penitentiary. Constitutional questions being involved, the appeal has been taken directly to this court. 43 Ill.2d R. 603.

The defendant and Gloria Neustader started living together in 1963. They continued this relationship until her death on January 29, 1968. On January 28, 1968, at about 4:30 P.M. Gloria left their home in defendant's car to go to work in a tavern which she owned and operated with the defendant. At about 1:30 A.M. January 29, the defendant left the home to go to his work delivering papers for a news agency. He picked up his helper Larry Smith and on his way to work he noticed his car which Gloria had driven parked along the street. He watched it for several minutes and then proceeded to the news agency where he loaded his truck and started his delivery route. Shortly after 5:00 A.M. defendant saw his car approaching. When the vehicles met he opened his window and asked Gloria if she had had fun at the other place. A vulgar remark constituted her reply and defendant turned his truck around, followed her home, parked his truck behind the car and got into the car with Gloria. During the course of an ensuing discussion and struggle Gloria was shot in the head. The helper Larry Smith had fallen asleep in the truck and did not witness the shooting. Defendant drove the car a few blocks away, parked it, returned to the truck and finished the paper route. Later he returned to the car and put the body in the trunk. That evening he again returned and drove the car several miles away and left it in the street. On February 6 the car was recognized by a friend who called Gloria's father at the

tavern. Defendant was also at the tavern and when informed that the car had been found he immediately went to it. After the police arrived the body was discovered in the trunk. After a routine investigation at the scene, the defendant at the request of the police went to the police station with a detective. A number of friends of the deceased were also at the station for general questioning. Defendant arrived at the station about 6:00 or 6:30 P.M. The detective took him into a small room adjoining a large "squad room" and questioned him about his relationship with Gloria. Defendant stated that he last saw Gloria at 4:30 P.M. on January 28 when she left for work. The detective then left the room and questioned others who were present.

During the questioning discrepancies were noted in defendant's story when compared with the story of his helper and the information gained from a friend of Gloria's. These two then repeated their accounts in the presence of defendant who was then informed that he was a suspect and that he was under arrest. This occurred about 8:00 P.M. He was admonished as to his constitutional rights and he later voluntarily gave an oral statement. About 2:30 A.M. an assistant State's Attorney, after again admonishing defendant of his constitutional rights, took a question and answer statement from the defendant in the presence of a court reporter. In the written statement and in defendant's testimony at the trial he maintained that when he got into the car with Gloria she had a gun in her hand and in the scuffle for its possession it discharged and the bullet struck her in the head.

The defendant first contends that the detention and questioning before he was a suspect constituted an illegal seizure of defendant in violation of the fourth amendment to the Federal constitution and that the statement later given to the assistant State's Attorney was the product of the illegal seizure and inadmissible as evidence. In support of this contention defendant cites *Davis* v. *Mississippi,* 394 U.S.

721, 22 L. Ed. 2d 676, 89 S. Ct. 1394, and *Morales* v. *New York,* 396 U.S. 102, 24 L. Ed. 2d 299, 90 S. Ct. 291.

In *Morales* the defendant was taken to the police station where he confessed to having committed a murder. The Supreme Court held that the record did not permit a satisfactory evaluation of the facts surrounding the apprehension and detention of Morales insofar as the same related to the illegality of the detention and remanded the case for further proceedings. Although the court refrained from discussing the legality of custodial questioning on less than probable cause for a full-fledged arrest, it did state that, given a chance to develop the circumstances leading to the detention of Morales and his confessions, "the State may be able to show that there was probable cause for an arrest or that Morales' confrontation with the police was voluntarily undertaken by him or that the confessions were not the product of illegal detention." 24 L. Ed. 2d 299 at 302.

In *Davis* the State made no claim that the defendant voluntarily accompanied the police officers to the police station where he was finger printed. Although the detention was in the investigatory rather than at the accusatory stage, it was nonetheless a "detention." In the present case the evidence discloses there was no detention of the defendant. He and several others were asked to come to the police station so the police "could get a story as to when the deceased was last seen, who her friends were, where she would go, things of this type." The evidence shows that the defendant rode to the station with a detective and others rode with other officers. The defendant went voluntarily. The evidence indicates that in the language quoted above from *Morales,* defendant's "confrontation with the police was voluntarily undertaken."

In his reply brief filed in this court defendant concedes that he voluntarily accompanied the police to headquarters but insists that his confrontation with the police did not continue to be voluntary. No doubt after the arrival at the

station and the commencement of the questioning the defendant's knowledge of his own involvement and the falsity of the story he had told about last seeing Gloria at 4:30 P.M. on January 28 made him feel more "detained" within the confines of a police station than he did while on the street. However, the evidence does not indicate that defendant was treated differently from the others or that he was at the station for other than general questioning until the discrepancy was noted in his story. The evidence does not support his contention that he was interrogated continuously after his arrival at the station. There were intervals of time when he was left alone in the room while the officers were talking to others. One such interval was of at least twenty minutes duration. The door to the room was never locked and at times was left open. The defendant was at the station an hour and a half to two hours before he became a suspect. There is nothing that indicates that this constituted a detention. His rights under the fourth amendment to the Federal constitution were not violated.

Defendant asserts that the written statement which he gave to the assistant State's Attorney at 2:30 A.M. should not have been admitted into evidence because it was induced by and the product of his earlier oral statement. The detective testified that at 8:00 P.M. when the defendant was informed that he was a suspect he was also advised of his constitutional rights. However, defendant now insists that he was not at that time given the proper *Miranda* warnings (*Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) and under the authority of *Westover* v. *United States,* 384 U.S. 494, 16 L. Ed. 2d 735, the subsequent written statement was inadmissible.

There is nothing in the record that gives us the substance or any indication of the content of any oral statement the defendant may have made after the 8:00 P.M. admonishment. The detective testified that the written statement was different from and did not incorporate the oral statement.

The defendant testified on the hearing on the motion to suppress. He said nothing about anything that transpired between 8:00 P.M. and 2:30 A.M. He did not testify that the subsequent written statement was in any way the product of any previous interrogation or that he felt compelled to give a written statement because of anything he may have previously said to the detective. It would appear that if the written statement had in any way been influenced by any previous interrogation or conduct, the defendant would have given some testimony from which such an inference could have been drawn. We conclude that the written statement was properly admitted into evidence.

Defense counsel complains of prejudicial and unsupported insinuations of the prosecutor while cross-examining the defendant. The defendant who takes the stand and testifies in his own behalf in a criminal case not only offers himself as a witness in his own behalf but thereby subjects himself to legitimate cross-examination. The extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial court. It is only in the case of a clear abuse of such discretion resulting in manifest prejudice to the defendant that a court of review will interfere. (*People* v. *Provo,* 409 Ill. 63; *People* v. *Nicholls,* 42 Ill.2d 91.) We have carefully examined the cross-examination of defendant and have closely scrutinized the parts thereof complained of. We do not consider the same to be prejudicial.

During the cross-examination of the deceased's son he tried to tell what he had seen, whereas defense counsel tried to limit his answer to what he had heard. This provoked the son to make the following remark: "You are trying to twist the questions around. You should ask me directly, not twist them all around. I do know what I seen." Defense counsel then stated: "Your honor, I think that is an unfair characterization of either the process of cross-examination or the manner in which this cross-examination is being carried

out. I respectfully request the court to ask the jury to please disregard such remarks from the witness as being unfair, harmful, prejudicial and detrimental to the defense in this case." The court replied, "Proceed, Mr. Parker" (defense counsel). Defendant now contends that the court committed error in not admonishing the jury as he was requested. The State was not responsible for the questions asked by the defense counsel on cross-examination nor the answers thereto given by the State's witness. (*People* v. *Henry,* 3 Ill.2d 609; *People* v. *Burage,* 23 Ill.2d 280.) A statement by the court to the witness admonishing him to confine himself to answering the questions asked would have been in order but it would have hardly been appropriate for the judge to instruct the jury that these remarks were "unfair, harmful, prejudicial and detrimental to the defense" as counsel requested. Generally, if a witness on cross-examination gives an answer not responsive to a question on motion the unresponsive portion will be stricken. (6 Callaghan's Illinois Evidence, sec. 17.08.) However, this outburst was not an answer to a question, nor a statement concerning anything involved in the trial. It can best be described as an argument between the witness and counsel. The jury heard the witness on direct examination testify as to the incident involved in the cross-examination and they observed the tenor of the entire cross-examination. They had an adequate opportunity to determine whether defense counsel's interrogation was as characterized by the witness, or whether the characterization by the witness was "unfair, harmful" *etc.* as counsel described the outburst.

During the cross-examination of another State's witness defense counsel attempted to establish that the witness had been intimate with the deceased. We have observed above that the limitation to be placed on the cross-examination of a witness rests in the sound discretion of the court. Although the court should have permitted a broad latitude of cross-examination to disclose the bias or prejudice of the witness

against the defendant, any injury to defendant's position occasioned by the limitation was rectified when the defendant testified in his own behalf. He was permitted to testify that he had discovered the witness and the deceased in an intimate situation and that the witness had threatened him with a gun. Defense counsel also complains that defendant on direct examination was not permitted to testify concerning the facts of defendant's second meeting with this witness. No offer of proof was made after the objection was sustained so we have no way of knowing what the testimony would have been as to the second meeting and whether its exclusion was error.

We cannot accept defendant's contention that he was not proved guilty beyond a reasonable doubt. The only direct evidence of the shooting is contained in his statement and his testimony both of which assert that the deceased had the gun and was shot in the struggle for its possession. The defendant relies on *People* v. *Jordan,* 4 Ill.2d 155, in support of his contention that his account, being the only direct evidence, must be accepted. The factual picture in *Jordan* is absent the surrounding circumstances present here and in fact *Jordan* acknowledges that the sole version given by the defendant may be contradicted by other circumstances shown in the record. Contradicting circumstantial evidence in our case shows that defendant had been irritated by the deceased's sexual activities with other men. As a result he had beaten her and threatened to kill her. On the night in question deceased had not returned to her home. Defendant saw her car parked on the street. He was suspicious of her being with another man. Later that morning when their vehicles met he asked her if she had enjoyed herself and she answered with a vulgar remark after which defendant turned his truck around, followed her home, got into the car with her and the shooting followed. The testimony of the pathologist as to the angle that

the bullet entered the skull is also inconsistent with defendant's version. After the shooting defendant attempted to secrete the body by placing it in the trunk of the car and parking the car on the street several miles away from his home. He did not tell anyone of the death even when Gloria's absence was discussed by her father and brother. At their insistence he finally reported to the police that she was missing. Not until her body was found in the trunk of the car eight days after her death did he finally disclose his version of the shooting. The jury had the opportunity to evaluate the defendant's testimony as to the manner in which Gloria met her death in the light of all of these other facts and circumstances established by the evidence.

Objection is made to the giving of People's instruction concerning flight. It is argued that the conduct of the defendant did not constitute flight and therefore it was error to give the instruction. The instruction told the jury that if they believed beyond all reasonable doubt that the defendant, immediately after the commission of the crime, fled and remained away until taken into custody, such flight is a proper circumstance to be considered in the guilt or innocence of the defendant. This instruction did not tell the jury that defendant had fled. It simply instructed them that if from the evidence they found that the defendant had fled then they could consider that fact. Although defendant's conduct does not conform to our traditional concept of flight, it was nonetheless quite unusual and designed to conceal defendant's involvement in the crime and to escape arrest. The jury had a right to consider such conduct. Under these facts and the circumstances of this case we do not see how the giving of this instruction could have reasonably affected the verdict. *People* v. *Weisburg*, 396 Ill. 412.

Regarding defendant's final contention we find that the sentence imposed was not excessive. The hearing in aggravation developed that the defendant had a prior felony con-

viction. The sentence imposed was within the limits provided by statute (Ill. Rev. Stat. 1967, ch. 38, par. 9—1(b)) and could have in fact been much more severe. We find nothing in the record to warrant a modification thereof. *People* v. *Bonner,* 37 Ill.2d 553.  *Judgment affirmed.*