THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE
JARDON, Defendant-Appellant.

First District (2nd Division)   No. 1—07—0145

Opinion filed July 28, 2009.

Patricia Unsinn and Pamela Rubeo, both of State Appellate Defender's
Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Annette Collins, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

Following a bench trial, the defendant was convicted of second degree murder (720 ILCS 5/9—2(a)(1) (West 2004)) and sentenced to a term of 20 years in prison. On appeal, the defendant challenges his conviction and sentence, asserting that (1) the trial court erred in failing to suppress his videotaped statement because he was arrested without probable cause and (2) because he was 16 years old at the time of the offense, he should have been sentenced as a juvenile under the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1—1 *et seq.* (West 2004)) rather than as an adult under the Unified Code of Corrections (730 ILCS 5/5—1—1 *et seq.* (West 2004)). For the reasons that follow, we vacate the defendant's conviction and sentence and remand the cause with directions.

The record reveals that the defendant was charged with first degree murder and aggravated unlawful use of a weapon (720 ILCS 5/9—1, 24—1.6 (West 2004)) for the May 11, 2004, fatal shooting of Jonathon Collazo. Codefendant Alfonso Carnalla was also charged in connection with the shooting. Because the defendant was 16 years old and had been charged with first degree murder, his case was automatically transferred from juvenile court to criminal court pursuant to section 5—130(1)(a) of the Act (705 ILCS 405/5—130(1)(a) (West 2004)).

Prior to trial, the defendant and codefendant Carnalla filed separate motions to quash their arrests and to suppress evidence. The evidence presented at the joint hearing on the pretrial motions established the following relevant facts.[1]

The shooting of Jonathon Collazo occurred at approximately 5:30 p.m. on May 11, 2004, in the 1900 block of North Keystone Avenue in Chicago, and several police officers and detectives were immediately assigned to investigate the crime. After arriving at the scene, Detective Robert Carrillo was informed by Cook County Sheriff James Meyer that a blue Grand Marquis, bearing a license plate with the number "3883151," was alleged to have been involved in the shooting incident. One of the investigating officers checked the ownership of that license plate and learned that it was registered to Alfonso Carnalla, Sr., who lived at 2442 North Austin Avenue in Chicago.

---

[1]Although the defendant and codefendant Carnalla participated in the joint pretrial hearing, they were tried separately, and Carnalla is not a party to this appeal.

Officer Rene Arriazola, testified that he was informed by Detective Carrillo that the shooting allegedly occurred from a moving vehicle. Carrillo also advised him of the description of the car, its license plate number, and the name and address of the owner. Arriazola stated that he was also informed that the windshield and side panels of the car were damaged and that the occupants of the car had been described as "youthful male Hispanics."

According to Arriazola, he and several other police officers drove to the alley behind 2442 North Austin Avenue. As they pulled up, the overhead garage door opened, and they observed a blue Grand Marquis bearing a license plate that matched the number they had been previously provided. Arriazola saw a young Hispanic male and a Hispanic female standing in the garage, several feet from the car. Arriazola did not see anyone inside or exiting the car, nor did he know how long the car had been parked in the garage. Officer Arriazola admitted that he and the other officers entered the garage without a warrant and, before asking any questions, escorted the young man, whom they later learned to be codefendant Carnalla, out of the garage. The police conducted a pat down search of Carnalla to verify that he was not armed, cuffed him, and placed him in the backseat of a squad car.

Arriazola further testified that Carnalla was advised of his *Miranda* rights and stated that he understood them before he agreed to speak with the police. Carnalla then told the police that he had been driving the vehicle that was involved in the shooting and that his cousin, whose nickname was "Joker," was the shooter. Carnalla also stated that, after the shooting incident, he drove "Joker" and the other passengers in the car to a house located at 2911 North Monitor. Arriazola testified that Carnalla described "Joker" as a Hispanic male who was wearing a plaid shirt and had a haircut with a shaved pattern. Carnalla also said that his girlfriend, Sandra Delgado, was in the front seat of the car at the time of the shooting, but he did not describe the other occupants of the car, the gun, or provide specific details about the victim and the circumstances of the shooting.

Arriazola stated that, at approximately 8 p.m., he drove to 2911 North Monitor while Carnalla was still in the backseat of the squad car. There, they saw a group of about 10 people, including five young Hispanic males, standing in the front yard. According to Arriazola, one of those individuals matched the description of the shooter that had been provided by Carnalla. Arriazola testified that Carnalla indicated that the shooter was among the people standing in the yard, and he described that person's clothing, but Carnalla did not specifically point out any individual member of the group. Arriazola drove past the house toward the end of the block and dispatched a radio

message to his fellow officers with a description of the suspect's appearance and clothing. The following officers exited their vehicles, and Arriazola saw that everyone in the yard, including the defendant, was ordered onto the ground. Arriazola subsequently learned that the defendant had been arrested.

Codefendant Carnalla testified that, at approximately 6 p.m. on May 11, 2004, he and his mother, Sarah Carnalla, were in their garage when they heard a car driving down the alley. Carnalla's mother thought the car might be that of his older brother, and she told him to open the overhead door of the garage. Carnalla stated that, when he opened the garage door, he saw 8 to 10 police officers facing the garage, with their guns drawn. According to Carnalla, he was standing about two feet away from the car at the time. The police officers did not ask any questions, but ordered him and his mother to raise their hands. Two of the officers then grabbed him by the arm and took him out of the garage. The officers searched him for weapons, cuffed him, and put him in a squad car, where they questioned him about the shooting. Carnalla testified that, in response to questions by the police, he said that the defendant and others were with him while he was driving the car earlier that day. He also told the officers that the defendant had fired a gun from the car and that he later dropped the defendant off at 2911 North Monitor. Carnalla further stated that he gave the police a description of the defendant's clothing on the day of the shooting. According to Carnalla, while he was handcuffed and seated in the back of the squad car, he saw some of the officers search his father's vehicle, which had a broken windshield and damage to both sides. A shell casing was recovered during the search. Carnalla testified that he was not advised of his *Miranda* rights, and the police did not show him either an arrest warrant or a search warrant. He further stated that neither he nor his mother gave the police permission to search the car.

The defendant testified that, at 8:13 p.m. on May 11, 2004, he was standing on the front lawn at 2911 North Monitor, along with about 12 other people, including Edwin and Alex Torres, when three unmarked police cars pulled up. Three officers exited their cars and approached the group with their guns drawn. The officers ordered him and several other people to lie face down on the ground. The defendant testified that, at that time, he felt like he was under arrest and not free to leave. Before being ordered to the ground, the defendant was not asked to identify himself, nor was he shown an arrest warrant. He was subsequently taken to the police station where he was questioned and fingerprinted.

At the close of the joint hearing on the defendants' motions to quash their arrests and to suppress evidence, the trial court denied

Carnalla's motion, finding that there was probable cause for his arrest. The trial court granted the defendant's motion, based on the determination that Carnalla's statement implicating him was not supported by sufficient indicia of reliability and did not establish probable cause for his arrest.

On the State's motion, the court thereafter conducted an attenuation hearing to determine whether the defendant's statements were admissible against him despite the fact that the police lacked probable cause at the time of his arrest. The only witness called was Detective Carrillo, who testified that on the night of May 11, 2004, several individuals were brought to the police station for questioning about the shooting, including Edwin and Alex Torres and Sandra Delgado, who was a passenger in the car when the shots were fired. Each of these individuals was interviewed by Carrillo or by his partner between 9 p.m. and midnight, and the State's Attorney's office was notified about the investigation. Assistant State's Attorney (ASA) Jane Sack interviewed Delgado at approximately 4:40 a.m. on May 12, 2004. The interview lasted for about 20 minutes and was conducted in the presence of Carrillo and a youth officer. After this interview, Sack offered to memorialize Delgado's remarks in a handwritten statement, and Delgado agreed. Delgado's handwritten statement, which was taken at 5:16 a.m., implicated the defendant in the shooting death of Collazo.

Carrillo published Delgado's handwritten statement, in which she stated that Carnalla was her boyfriend and that she knew the defendant and Edwin and Alex Torres, who were friends of Carnalla's and also were members of the La Raza street gang. Carnalla picked her up on May 11, 2004, and told her they were going "cruising," which she understood to mean driving around. They picked up Edwin Torres and the defendant at the defendant's house and then drove to a house on Monitor, where they picked up Alex Torres. Carnalla was driving, and she was in the front passenger seat. The defendant was sitting behind her, Alex was in the center backseat, and Edwin was behind Carnalla. The defendant told Carnalla to cruise by North Avenue. As they did so, the defendant and Edwin were talking about "smoking" an Ashland Viking gang member, which she understood to mean shoot one.

According to Delgado's statement, when they turned the corner near a store called "Jimenez," the defendant identified a member of the Ashland Vikings street gang, who started to run. The defendant pulled out a black gun and tried to shoot him through the car window, but the gun safety was on. Carnalla continued driving as they watched the Ashland Viking run through the alley. When they turned a corner, they saw a group of people standing in the street making gang signs

that were not La Raza signs. Delgado stated that she heard the defendant fire about five shots at the group as he was hanging out of the car window. She ducked down in her seat because she heard shots coming from outside of their car, and she assumed that someone was shooting at them. Carnalla drove down an alley, which was blocked by a truck. Because some people from the street had entered the alley behind them, Carnalla drove past the truck, scraping both sides of his car along the truck and a fence.

Delgado further stated that Carnalla subsequently turned onto a street, and they saw a group of men, who threw bricks and bottles at their car. A brick broke the windshield, and a bottle hit her and Carnalla. After driving a couple of blocks down the street, they encountered another group of people near a corner. The defendant and Edwin yelled "La Raza love" out of the window, and the men on the corner flashed opposing gang signs. Delgado stated that she ducked down and heard two to three more shots from the backseat of the car. Carnalla turned onto Armitage, hit another car, and then drove away from the scene of the accident. They drove to Alex and Edwin Torres' house on Monitor and remained there for about 30 minutes. During that time, the defendant and Alex and Edwin Torres were telling people at the house that they had "gotten" a rival gang member, which she understood to mean that they had shot him. According to Delgado, she later left the house on Monitor and walked to a house on Mango Street.

At the conclusion of her statement, Delgado identified photographs of the defendant, Carnalla, and Edwin and Alex Torres. She also attested that she had been treated well while being questioned by the police and the ASA and that she was not promised anything or threatened prior to giving her statement.

Following publication of Delgado's statement, Carrillo pointed out the defendant as the person Delgado had identified as the shooter when she gave her statement. Carrillo also testified that the defendant gave several statements to the police, including a videotaped statement at 7:13 a.m. on May 12, 2004, two hours after Delgado gave her handwritten statement. During that statement, the defendant was given his *Miranda* rights and acknowledged that he understood each of those rights.

On cross-examination, Carrillo testified that he was aware that Carnalla had identified Delgado as a passenger in the car and that he provided this information when he was questioned near his garage about two hours after the shooting. Carrillo was also aware that Carnalla had led police officers to the Monitor address and that the defendant was arrested at 8:13 p.m. At 9:50 p.m., the defendant was interviewed by two detectives and a youth officer. After being advised

of his *Miranda* rights, the defendant made his first inculpatory state-
ment, in which he admitted that he was the shooter. The defendant's
videotaped statement, which was taken at 7:13 a.m. the following
morning, was "in essence the same thing" as his prior oral statement.

At the conclusion of the attenuation hearing, the trial court reaf-
firmed its ruling that the defendant's first oral statement was inadmis-
sible, but determined that the videotaped statement, given at 7:13
a.m. on May 12, 2004, was admissible because it was not the product
of either the defendant's illegal arrest or his first oral statement. In
particular, the court found that Sandra Delgado's statement created
probable cause to support the defendant's arrest and that the police
were acting in good faith. Thus, the court denied the defendant's
request to suppress his videotaped statement.

At trial, ASA Charles Brinkman testified that he was present when
the defendant was questioned at 2 a.m. and at 5 a.m. on May 12, 2004.
During the 5 a.m. interview, the defendant agreed to have his state-
ment memorialized in a videotaped statement, and the consent form
was signed by all of the people present, including the defendant's
mother.

The State presented the defendant's videotaped statement, in
which he admitted his involvement in the shooting death of Jonathon
Collazo. The defendant stated that, on May 11, 2004, he was a pas-
senger in the car driven by Carnalla. According to the defendant, he
was riding in the backseat, along with Alex and Edwin Torres, while
Sandra Delgado was in the front passenger seat. The defendant also
stated that he had a loaded gun with him at the time, and he admitted
that he, Carnalla, and the Torres brothers were members of the La
Raza street gang. The defendant indicated that, while they were driv-
ing around, they saw an individual named "David," whom they knew
to be a member of the Ashland Vikings, a rival gang. According to the
defendant, he tried to shoot David, but he had forgotten to take the
safety off the gun, and David ran away. They followed David and found
him in the next alley with a group of Ashland Vikings. In his state-
ment, the defendant admitted that he shot at the group two or three
times before Carnalla drove away. Carnalla then drove into an alley,
which was blocked by a truck, and the sides of Carnalla's car were
damaged when he drove past the truck. At the corner of Keystone and
Armitage Avenues, they saw a group of Maniac Latin Disciples,
another rival gang that had been giving Alex Torres trouble.

In his statement, the defendant indicated that he did not do
anything until the Maniac Latin Disciples began throwing bricks and
bottles at their car. A brick inside of a sock was tossed like a sling at
the windshield, and bottles were thrown inside the car. The windshield

was broken, and Sandra Delgado was cut on her shoulder by a bottle. The defendant stated that, after the Maniac Latin Disciples started "bricking" their car, he shot at the group four or five times. As Carnalla was driving away, he struck another vehicle in the intersection of Armitage and Keystone Avenues. According to the defendant's statement, Carnalla dropped him and the Torres brothers off at the Torres' home on Monitor Avenue, where he reloaded the gun and hid it under a mattress in the basement.

The State also called Sandra Delgado as a witness, and she described the events of May 11, 2004, and the circumstances of the shooting. Delgado's testimony was substantially consistent with her handwritten statement, but she stated that portions of her prior handwritten statement were inaccurate. In particular, Delgado testified that the defendant fired the gun at the same group of individuals who had thrown bottles and bricks at their car.

Kevin Heye testified that he was involved in the collision with Carnalla, and, on the night of the shooting, he identified the blue Marquis parked in Carnalla's garage as the same vehicle that struck his car. Heye further testified that he saw a hand with a gun extended out of the passenger side window, and he heard a gunshot before Carnalla's car hit his vehicle.

In addition the State presented evidence that a search of the house at 2911 North Monitor resulted in the recovery of a 9-millimeter firearm, which was found under a mattress in a basement bedroom, and the parties stipulated that the shell casings recovered from the scene were fired from that weapon.

The defendant testified on his own behalf, and his testimony was consistent with his videotaped statement, except he explained that he shot at the Maniac Latin Disciples because he was in fear for his safety and the safety of the other occupants of the vehicle. He also testified that, between the time the boys encountered the Ashland Vikings and the group of Maniac Latin Disciples, they also came upon a group of Young Latin Disciples at the corner of Wabansia and Keystone Avenues. The defendant stated that he saw the Young Latin Disciples display gang signs, and he thought he heard gunfire coming from outside of the car.

On September 1, 2006, the trial court found the defendant guilty of second degree murder based on a determination that the defendant unreasonably believed that his conduct was necessary to defend himself and the other occupants in the car. The court scheduled the sentencing hearing for October 3, 2006, and stated that "[a]ny post-trial motions must be given to the Court at least 72 hours in advance." When the parties appeared on October 3, 2006, the defendant

presented his posttrial motion asserting that (1) he was not proven guilty beyond a reasonable doubt, (2) his use of force was reasonable and justified, (3) he was deprived of his constitutional right to a fair trial, and (4) the trial court erred in finding that his videotaped statement was admissible because it was sufficiently attenuated from his illegal arrest. The defendant's motion was denied.

On that same date, the State presented a motion, pursuant to section 5—130(1)(c)(ii) of the Act, requesting that the court sentence the defendant as an adult. The defendant objected to the State's motion and requested that he be sentenced as a delinquent minor under the Act. In particular, the defendant asserted that consideration of the statutory factors indicated that he should be sentenced as a juvenile. The defendant did not object to the lack of timeliness or written notice of the motion. Upon consideration of the arguments of counsel and the factors set forth in section 5—130(1)(c)(ii), the court determined that the defendant should be sentenced as an adult. After hearing evidence and arguments in aggravation and mitigation, the court imposed a sentence of 20 years in prison. The defendant's motion for reconsideration of his sentence was denied, and this appeal followed.

On appeal, the defendant argues that the trial court erred in refusing to suppress his postarrest videotaped statement. In reviewing a ruling on a motion to suppress, we employ a two-part standard of review. *People v. Cosby*, 231 Ill. 2d 262, 271, 898 N.E.2d 603 (2008). The trial court's factual findings are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *Cosby*, 231 Ill. 2d at 271. Yet, a reviewing court " 'remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted.' " *Cosby*, 231 Ill. 2d at 271, quoting *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). Consequently, the court's ultimate legal ruling granting or denying the motion is subject to *de novo* review. *Cosby*, 231 Ill.2d at 271.

A finding that the defendant's arrest was illegal does not resolve the issue of whether his confession is admissible. *People v. Morris*, 209 Ill. 2d 137, 157, 807 N.E.2d 377 (2004), *overruled in part, People v. Pitman*, 211 Ill. 2d 502, 512-13, 813 N.E.2d 93 (2004) (decision in *Morris* overruled to the extent that it was inconsistent with the standard of review articulated in *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996)); *People v. Foskey*, 136 Ill. 2d 66, 85, 554 N.E.2d 192 (1990). Instead, it is incumbent on the court to determine whether the confession resulted from exploitation of the illegal arrest or was obtained by means which were sufficiently attenuated to be purged of the primary taint of the illegal arrest. *Morris*, 209

Ill. 2d at 157. The following factors to be considered in determining whether a confession was the product of an illegal arrest: (1) whether *Miranda* warnings were given; (2) the amount of time between the defendant's arrest and his statement; (3) whether there were intervening circumstances; and (4) the degree of flagrancy of police misconduct. *Morris*, 209 Ill. 2d at 157, citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975); *Foskey*, 136 Ill. 2d at 85-86. Illinois courts have held that the existence of intervening circumstances and the flagrancy of police misconduct are considered to be the two most important factors in determining whether the defendant's confession resulted from exploitation of the illegal arrest. *People v. Klimawicze*, 352 Ill. App. 3d 13, 19, 815 N.E.2d 760 (2004); *People v. Wilberton*, 348 Ill. App. 3d 82, 85, 809 N.E.2d 745 (2004). The State bears the burden of showing the admissibility of the statement. *Morris*, 209 Ill. 2d at 157-58, citing *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.

■ We first consider the issuance of *Miranda* warnings. Although the giving of *Miranda* warnings, in itself, is not sufficient to dissipate the taint of an illegal arrest, it is a factor to be considered in deciding whether the defendant's statement was attenuated. *Morris*, 209 Ill. 2d at 158; *Foskey*, 136 Ill. 2d at 86. Here, the defendant does not dispute that he was advised of his *Miranda* rights prior to giving each of his oral statements and his videotaped statement. Therefore, though not determinative, this factor weighs in favor of attenuation.

The next factor to be considered is the proximity in time between the defendant's illegal arrest and his inculpatory statement. The temporal proximity between an arrest and a confession is often an ambiguous factor, and its significance will depend upon the circumstances of each individual case. *Morris*, 209 Ill. 2d at 160, citing *People v. White*, 117 Ill. 2d 194, 223-24, 512 N.E.2d 677 (1987).

In this case, the defendant was arrested at 8:13 p.m. on May 11, 2004, and he gave an oral inculpatory statement approximately 90 minutes later at 9:50 p.m. He was subsequently questioned by ASA Brinkman at 2 a.m. and at 5 a.m. the next morning. The defendant then gave his videotaped statement at 7:13 a.m., 11 hours after his arrest. Contrary to the defendant's assertion, the record does not reflect that he was continuously interrogated. In addition, the length of the defendant's detention and the chronology of the four interrogation sessions indicate that the defendant had adequate time to consider the situation and his decision to give the videotaped statement. Also, there is no indication that the defendant was subjected to any coercive conduct prior to giving his videotaped statement. Therefore, although the passage of time is generally considered an ambiguous factor, we

believe that, under the circumstances presented here, this factor supports a finding of attenuation.

The third *Brown* factor requires an examination of whether intervening circumstances existed. With regard to this factor, the defendant challenges the trial court's finding that Delgado's handwritten statement provided the police with intervening probable cause, which attenuated the videotaped statement from his illegal arrest. We are unpersuaded by this argument.

Intervening circumstances are those that sever the causal connection between the taint of an illegal arrest and an incriminating statement by the defendant. *Klimawicze*, 352 Ill. App. 3d at 20. The acquisition of evidence that implicates the defendant in the crime, such as the statement of a witness or a codefendant, may serve as an intervening circumstance in one of two ways. See *Klimawicze*, 352 Ill. App. 3d at 20-23; *Wilberton*, 348 Ill. App. 3d at 87-89. First, such evidence may induce the defendant to confess voluntarily. *Klimawicze*, 352 Ill. App. 3d at 20; *Wilberton*, 348 Ill. App. 3d at 86, 89. In such a circumstance, the defendant must be confronted with the newly acquired evidence before making the inculpatory statement sought to be admitted. See generally *Klimawicze*, 352 Ill. App. 3d at 21-22; *Wilberton*, 348 Ill. App. 3d at 86. Second, the new evidence may purge the taint of an illegal arrest by providing the probable cause that was previously lacking. *Morris*, 209 Ill. 2d at 158-59; *Klimawicze*, 352 Ill. App. 3d at 20-21; *Wilberton*, 348 Ill. App. 3d at 86-88.

Probable cause exists where the totality of circumstances and facts known to officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. *Morris*, 209 Ill. 2d at 159. The acquisition of intervening probable cause is considered to be "an important factor in the attenuation analysis," despite the fact that it will not always ensure that the police did not exploit an illegal arrest. *Morris*, 209 Ill. 2d at 158, citing *People v. Ornelas*, 295 Ill. App. 3d 1037, 1045, 693 N.E.2d 1247 (1998); *People v. Pierson*, 166 Ill. App. 3d 558, 564, 519 N.E.2d 1185 (1988); *United States v. Cherry*, 759 F.2d 1196, 1212 (5th Cir. 1985); see also *Wilberton*, 348 Ill. App. 3d at 87. Illinois courts have repeatedly found that the acquisition of intervening probable cause supports a finding of attenuation. See, *e.g.*, *Morris*, 209 Ill. 2d at 159-61; *Wilberton*, 348 Ill. App. 3d at 88; *People v. Wright*, 294 Ill. App. 3d 606, 613, 691 N.E.2d 94 (1998); *Pierson*, 166 Ill. App. 3d at 564.

In this case, the handwritten statement of Delgado, which affirmatively identified the defendant as the shooter, was given at 5:15 a.m. on May 12, 2004, two hours before the defendant gave his videotaped statement. Also, Delgado's statement contained numerous

details that were corroborated by other evidence collected by the police, including the recovery of shell casings from particular locations, Heye's description of the collision with his vehicle just after several shots were fired from the passenger side of Carnalla's car, and the damage to Carnalla's car, which was observed by Heye before the collision. In light of these facts, we agree that at the time of Delgado's handwritten statement, the police had probable cause to connect the defendant with the shooting of Collazo.

In challenging the trial court's determination, the defendant argues that Delgado's statement cannot be considered an intervening circumstance sufficient to establish attenuation because it was obtained as a result of Carnalla's illegal arrest and was, therefore, tainted. See *People v. Jackson*, 374 Ill. App. 3d 93, 105, 869 N.E.2d 895 (2007) (illegally obtained statement from a codefendant is not an attenuating circumstance); *People v. Clay*, 349 Ill. App. 3d 517, 524, 812 N.E.2d 473 (2004) (same); *People v. Austin*, 293 Ill. App. 3d 784, 789-91, 688 N.E.2d 740 (1997) (same); *People v. Beamon*, 255 Ill. App. 3d 63, 70, 627 N.E.2d 316 (1993) (same). This argument is without merit.

Initially, we observe that the supreme court has held that a defendant does not have standing to contest the trial court's ruling as to the legality of the arrest of a codefendant. *People v. James*, 118 Ill. 2d 214, 225-26, 514 N.E.2d 998 (1987). However, even if we were to consider the legality of Carnalla's arrest, we would find the defendant's argument unpersuasive.

As noted above, Carnalla contested the legality of his arrest at trial but was unsuccessful, and there is no indication that he attempted to raise the issue on appeal. See *Klimawicze*, 352 Ill. App. 3d at 21 (finding no reason to doubt the legality of the codefendant's arrest where the trial court denied the motion to quash arrest and the codefendant did not challenge that ruling on appeal). In addition, the record demonstrates that within minutes of the shooting, Heye informed the police that a blue Marquis with a smashed windshield was speeding north on Keystone Avenue when he heard gunshots and saw a hand, which was holding a gun, extended from the passenger side window of the Marquis. Heye said that he heard another gunshot before his car was struck by the Marquis, in which there were several occupants. He gave the police a description of the Marquis, including the license plate number, which was registered to Alfonso Carnalla, Sr. The police were also informed that the Marquis was damaged on both sides and that its occupants were young male Hispanics. Upon arriving at Carnalla's address within two hours of the shooting, the police saw the garage door open, revealing the defendant standing a few feet from a blue Grand Marquis with a damaged windshield and side panels

and bearing the license plate that matched the number given to them by Heye. This evidence was sufficient to establish probable cause to believe that Carnalla was involved in the shooting. Accordingly, we reject the defendant's contention that Carnalla was illegally arrested during a "fishing expedition" conducted by the police. See *People v. Goins*, 161 Ill. App. 3d 541, 546-47, 515 N.E.2d 195 (1987) (holding that, where general physical descriptions of the offenders was accompanied by other specific information linking the suspects to the crime, information was adequate to find probable cause to arrest).

The defendant also argues that Delgado's statement cannot be considered an intervening circumstance because he was not advised of or confronted with her statement prior to giving his videotaped statement. This argument, however, ignores the fact that the statement of a witness or codefendant can serve as an intervening circumstance in either of two ways. See *Klimawicze*, 352 Ill. App. 3d at 20-23; *Wilberton*, 348 Ill. App. 3d at 87-89. If the statement was used as an inducement to motivate the defendant to confess voluntarily, then the defendant must be confronted with the newly acquired evidence before making the inculpatory statement sought to be admitted. See *Klimawicze*, 352 Ill. App. 3d at 20-22; *Wilberton*, 348 Ill. App. 3d at 86, 89. However, where the new evidence severs the causal connection to the illegal arrest by providing the probable cause that was previously lacking, there is no need for the police to confront the defendant with that evidence, and we have found no cases imposing such a requirement. See *Morris*, 209 Ill. 2d at 158-59; *Klimawicze*, 352 Ill. App. 3d at 20-21; *Wilberton*, 348 Ill. App. 3d at 86-88.

We also reject the claim that Delgado should be considered "an accomplice" and that, because her statement was not supported by sufficient indicia of reliability, it could not serve as an intervening circumstance to purge the taint of the defendant's illegal arrest. This was not a typical codefendant's statement, which might require independent *indicia of reliability*. See *Wright*, 294 Ill. App. 3d at 612, citing *James*, 118 Ill. 2d 214. Delgado had not been arrested for the murder, and there was no evidence that she had participated in the gang-related hostilities or the shooting in any way. The person she implicated was someone she had known for about a year and who was the cousin of her boyfriend; they were not strangers or enemies. Though the police might have initially considered Delgado a suspect in the investigation, which would give her an incentive to cooperate with the police, that fact alone is insufficient to make her statements unreliable; instead it is one of the factors to be considered in assessing the totality of the circumstances supporting probable cause. See *Wright*, 294 Ill. App. 3d at 613, citing *People v. Lekas*, 155 Ill. App. 3d 391,

410, 508 N.E.2d 221 (1987). Moreover, "[a] partially corroborated statement of someone who would not be presumed credible (*e.g.*, an accomplice or paid informant) can establish probable cause for arrest." *Ornelas*, 295 Ill. App. 3d at 1045, citing *James*, 118 Ill. 2d at 222-24.

As recognized by the supreme court, "it would place an unreasonable burden on the police to require officers to release an illegally arrested defendant and then, based upon probable cause obtained after the illegal arrest, arrest him again when he reached the sidewalk." *Morris*, 209 Ill. 2d at 159. Here, the record affirmatively demonstrates that Carnalla had identified Delgado as a passenger in the car at the time of the shooting, and the information contained in Delgado's handwritten statement provided probable cause to arrest the defendant for the shooting of Collazo. This evidence was obtained independently of the defendant's illegal arrest. Accordingly, the existence of intervening probable cause weighs in favor of attenuation.

The fourth factor to be considered in determining whether the defendant's statement was admissible is the purpose and flagrancy of the police conduct. Defendant argues that the police conduct here was flagrant because his illegal arrest was undertaken as a "fishing expedition" in the hopes that detaining him would yield evidence of a crime.

Illegal arrests have been held to be purposeful and flagrant when undertaken solely to conduct "fishing expeditions" or where the defendant's arrest was accomplished in a manner calculated to cause fright, surprise and confusion. *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262. In assessing the reasonableness of police conduct, it is incumbent on the court to consider the duty of police to maintain order, prevent crime and apprehend criminals, often while acting on a quick appraisal of the information known at the time. *Goins*, 161 Ill. App. 3d at 546, citing *People v. Sanchez*, 107 Ill. App. 3d 240, 437 N.E.2d 744 (1982).

In this case, we do not agree with the defendant's suggestion that he was taken into custody as part of an "arrest sweep." Rather, the record indicates that the police conscientiously followed up on all leads and information received from the occurrence witnesses, including Heye, who described Carnalla's car, its license plate number and existing damage, and who told the police that the shots were fired from the passenger side of the vehicle. This evidence led the police to Carnalla, and his statements caused the police to question Delgado, who implicated the defendant. This record does not support the defendant's assertion that the police were acting upon such a paucity of information as to render entirely unreasonable any belief that there was probable cause to arrest the defendant. Moreover, there is no evidence that

the police engaged in promises, threats, mistreatment of the defendant, or acted in a manner designed to create surprise, fright, or confusion. See *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262. Consequently, the record fails to demonstrate that the defendant's videotaped statement was the result of flagrant police misconduct, and this factor also weighs in favor of attenuation.

Finally, we address the defendant's assertion that his videotaped statement should have been suppressed because it was the product of his first oral statement, which was held to be inadmissible. Illinois courts have rejected the adoption of a *per se* test that would exclude a second statement by an accused simply because the first statement was found to be inadmissible. *People v. Tankson*, 92 Ill. App. 3d 328, 333, 415 N.E.2d 1218 (1980); *People v. Andrus*, 37 Ill. App. 3d 533, 535, 346 N.E.2d 435 (1976). Accordingly, subsequent statements have been found to be admissible where no evidence was introduced at the hearing on the motion to suppress to indicate that the defendant had given the second statement because he had made the first. See *People v. Burris*, 49 Ill. 2d 98, 104, 273 N.E.2d 605 (1971); *Andrus*, 37 Ill. App. 3d at 535-36.

Here, the defendant did not present any evidence at the hearing on the motion to suppress indicating that he gave the videotaped statement only because he had previously given an oral inculpatory statement. *Cf. People v. Raddatz*, 91 Ill. App. 2d 425, 434-36, 235 N.E.2d 353 (1968) (the defendant testified that he believed the prior oral statement had conclusively established his guilt, and the inadmissibility of the first statement was conceded). Also, 11 hours elapsed between the defendant's two inculpatory statements, and the videotaped statement was given to ASA Brinkman as well as to Carrillo. *Cf. People v. Riszowski*, 22 Ill. App. 3d 741, 749, 318 N.E.2d 10 (1974) (second confession was inadmissible where there was no appreciable time lapse between it and the prior confession and where the statements were given to the same police officers). Based on the evidence presented at the suppression hearing, we do not believe that the existence of the defendant's initial oral statement rendered his subsequent videotaped statement inadmissible.

Upon consideration of the four *Brown* factors and the totality of the circumstances, we conclude that the taint of the defendant's illegal arrest had been purged by the time he gave his videotaped statement to the police. Consequently, we find no error in the trial court's refusal to suppress that statement. In light of our resolution of this issue, we need not address the State's argument that the information obtained from Carnalla established probable cause prior to the defendant's arrest.

The defendant also argues that the trial court erred in sentencing him as an adult pursuant to section 5—130(1)(c)(ii) of the Act. In response, the State initially asserts that the defendant has forfeited this argument by failing to raise it in the trial court. We do not agree.

It is well established that "a void judgment may be attacked at any time, either directly or collaterally, and courts have an independent duty to vacate void orders." *People v. Mathis*, 357 Ill. App. 3d 45, 51, 827 N.E.2d 932 (2005), citing *People v. Thompson*, 209 Ill. 2d 19, 27, 805 N.E.2d 1200 (2004); *People v. Wade*, 116 Ill. 2d 1, 5, 506 N.E.2d 954 (1987); see also *People v. Champ*, 329 Ill. App. 3d 127, 129, 768 N.E.2d 237 (2002). "A judgment is void if the court entered it without personal or subject matter jurisdiction or if the court 'lacked the power to render the particular judgment or sentence.' " *People v. Santana*, 388 Ill. App. 3d 961, 964, 904 N.E.2d 132 (2009), quoting *People v. Rodriguez*, 355 Ill. App. 3d 290, 296, 823 N.E.2d 224 (2005). Also, a sentence that does not conform to a statutory requirement is void. *People v. Arna*, 168 Ill. 2d 107, 113, 658 N.E.2d 445 (1995); *Santana*, 388 Ill. App. 3d at 964. An argument that a judgment is void is not subject to waiver. *Thompson*, 209 Ill. 2d at 27. Therefore, we reject the State's assertion that this issue may not be raised for the first time on appeal. See *Mathis*, 357 Ill. App. 3d at 53.

■ Turning to the substance of the defendant's claim, we find that it has merit. Section 5—130(1)(c)(ii) dictates the manner in which a juvenile defendant is to be sentenced following a conviction for an offense not covered by section 5—130(1)(a) of the Act. That section provides, in relevant part, as follows:

> "(ii) If after trial or plea the court finds that the minor committed an offense not covered by paragraph (a) of this subsection (1), that finding shall not invalidate the verdict or the prosecution of the minor under the criminal laws of the State; however, unless the State requests a hearing for the purpose of sentencing the minor under Chapter V of the Unified Code of Corrections, the Court must proceed under Sections 5—705 and 5—710 of this Article. To request a hearing, the State must file a written motion within 10 days following the entry of a finding or the return of a verdict. Reasonable notice of the motion shall be given to the minor or his or her counsel." 705 ILCS 405/5—130(1)(c)(ii) (West 2004).

This court has consistently held that the failure to comply with the terms of section 5—130(1)(c)(ii) requires that the defendant be sentenced as a juvenile. *Mathis*, 357 Ill. App. 3d at 53-55 (construing section 5—130(2)(c)(ii), which contains language that is virtually identical to the provision at issue here); *Champ*, 329 Ill. App. 3d at 132-33; *People v. Brazee*, 316 Ill. App. 3d 1230, 1235, 738 N.E.2d 646 (2000) (*Brazee I*).

Here, the defendant was found guilty of second degree murder, which is not included in section 5—130(1)(a) (705 ILCS 5—130(1)(a) (West 2004)) as an offense that requires the defendant to be tried as an adult. The conviction was entered on September 1, 2006, and the State did not file its motion requesting that he be sentenced as an adult until October 3, 2006, more than 30 days after the judgment. In addition, there is no indication that the State provided either the defendant or his attorney with any prior notice of its intent to file and present the motion at the sentencing hearing. Based on this record, there is no dispute that the State failed to adhere to the statutory 10-day filing deadline and notice provision and that the trial court's order sentencing the defendant as an adult was not in compliance with the terms of section 5—130(1)(c)(ii).

This finding, however, does not end our analysis. The relevant inquiry is the consequence of the State's failure to comply with the terms of the statute. In resolving this question, we must decide whether the filing deadline and notice requirement are mandatory or directory. See *People v. Robinson*, 217 Ill. 2d 43, 51-53, 838 N.E.2d 930 (2005). " '[T]he "directory" or "mandatory" designation *** denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' " *Robinson*, 217 Ill. 2d at 51-52, quoting *Morris v. County of Marin*, 18 Cal. 3d 901, 908, 559 P.2d 606, 610-11, 136 Cal. Rptr. 251, 255-56 (1977).

The determination of whether a statutory command is mandatory or directory is a question of statutory construction, which we review *de novo*. *Robinson*, 217 Ill. 2d at 54, citing *People v. Ramirez*, 214 Ill. 2d 176, 179, 824 N.E.2d 232 (2005). In construing statutory language, the court's primary objective is to ascertain and give effect to the intent of the legislature. *People v. Perry*, 224 Ill. 2d 312, 323, 864 N.E.2d 196 (2007). The most reliable indicator of legislative intent is the language used in the statute itself. *Robinson*, 217 Ill. 2d at 54. Consequently, when the statute expressly prescribes a consequence for the failure to obey a statutory provision, that is very strong evidence the legislature intended to impose a mandatory obligation. *Robinson*, 217 Ill. 2d at 54; *People v. Gargani*, 371 Ill. App. 3d 729, 735, 863 N.E.2d 762 (2007). A statutory provision that articulates a procedural command to a government official is mandatory if it is accompanied by negative language indicating that the acts required shall not be done in any other manner or time period. *Robinson*, 217 Ill. 2d at 57-58, citing *In re Application of the County Collector*, 132 Ill. 2d 64, 74-75, 547 N.E.2d 107 (1989); *People v. Jennings*, 3 Ill. 2d 125, 127, 119 N.E.2d 781 (1954). Moreover, employment of the term "must" in a statutory

provision indicates that the legislature intended to impose a mandatory duty. See *Mathis*, 357 Ill. App. 3d at 55, citing *Champ*, 329 Ill. App. 3d at 135.

We find that the filing deadline and notice requirement at issue in this case are mandatory and not subject to forfeiture. Section 5—130(1)(c)(ii) specifically provides that the trial court must sentence the defendant under the Act *"unless* the State requests a hearing for the purpose of sentencing the minor [as an adult]" and that in order to "request a hearing, the State *must* file a written motion within 10 days following the entry of a finding or the return of a verdict." (Emphasis added.) 705 ILCS 405/5—130(1)(c)(ii) (West 2004). Significantly, the language contained in section 5—130(1)(c)(ii) does not contain any exceptions, nor does it authorize either the minor respondent or the trial court to extend or waive the filing deadline or other statutory requirements. Thus, the requirement that the State's motion be filed within 10 days constitutes a mandatory duty and is accompanied by negative language prohibiting the court from sentencing the defendant as an adult if the State fails to comply with the filing deadline. See generally *In re Application of the County Collector*, 132 Ill. 2d at 75-76; *Mathis*, 357 Ill. App. 3d at 55. Because the terms of section 5—130(1)(c)(ii) of the Act are mandatory, the failure to comply with those provisions renders the sentencing order in this case void, and, contrary to the State's assertion, the imposition of an adult sentence cannot be characterized as harmless error.

In seeking to avoid this result, the State asserts, *inter alia*, that the timeliness and notice requirements are merely procedural and, therefore, the failure to comply with those statutory provisions rendered the sentencing order voidable, rather than void. According to the State, since the judgment was voidable, the defendant's failure to object in the trial court operated as a forfeiture of the issue on appeal, absent plain error. In support of this assertion, the State cites *In re M.W.*, 232 Ill. 2d 408, 905 N.E.2d 757 (2009), in which the minor respondent argued that her adjudication of delinquency was void for lack of subject matter jurisdiction because her father had not been served with written notice that the petition had been amended to add an additional charge. *In re M.W.*, 232 Ill. 2d at 413-14. The supreme court rejected this argument and held that the failure to provide notice of the amendment, as required by the Act, did not affect the trial court's subject matter jurisdiction or its exercise of personal jurisdiction over the minor and her father. *In re M.W.*, 232 Ill. 2d at 426, 428. The supreme court concluded that, because the trial court had both subject matter and personal jurisdiction, the failure to object to the lack of notice constituted a forfeiture of the issue unless the minor

could demonstrate plain error. *In re M.W.*, 232 Ill. 2d at 430-31. The State contends that, after *In re M.W.*, the decisions in *Mathis, Champ*, and *Brazee I* are "erroneous" and "no longer viable." This contention is without merit.

The decision in *In re M.W.* does not govern the instant case for several reasons. First, we observe that *In re M.W.* was predicated on entirely separate statutory provisions and different language from those at issue here. Compare 705 ILCS 405/5—130(1)(c)(ii) (West 2004) with 705 ILCS 405/5—530 (West 2004). In addition, the notice requirement that was pivotal in *In re M.W.* did not contain negative language or prescribe a consequence for the failure to obey the statutory command. 705 ILCS 405/5—530 (West 2004). Also, the supreme court's decision in *In re M.W.* did not address the question of whether the statutory notice requirement was mandatory or directory. Moreover, in *In re M.W.*, the supreme court acknowledged that a trial court exceeds its statutory authority over a justiciable matter by imposing a sentence that goes beyond the statutory limits. *In re M.W.*, 232 Ill. 2d at 422, citing *In re Jaime P.*, 223 Ill. 2d 526, 540, 861 N.E.2d 958 (2006) (holding that "where *** the circuit court's power to act is controlled by statute, the court must proceed within the statute's strictures, and any action taken by the court that exceeds its statutory power to act is void"). See also *Thompson*, 209 Ill. 2d at 23; *Arna*, 168 Ill. 2d at 113; *Wade*, 116 Ill. 2d at 5-6; *Santana*, 388 Ill. App. 3d at 964; *Rodriguez*, 355 Ill. App. 3d at 296.

We note that the State has relied upon numerous other cases in support of its contention that the sentencing order here was voidable, rather than void. In rejecting this argument, we have considered the cited cases and find them to be factually distinguishable and, therefore, unpersuasive. Also, because we have concluded that the filing deadline and notice provision set forth in section 5—130(1)(c)(ii) are mandatory and not subject to forfeiture by the defendant, we need not address the State's argument concerning plain error.

Finally, we address the defendant's contention that his criminal conviction for second degree murder must be vacated and that he should be adjudicated a delinquent minor. An identical argument was considered in *People v. Brazee*, 333 Ill. App. 3d 43, 775 N.E.2d 652 (2002) (*Brazee II*), which involved the statutory predecessor to section 5—130. In that case, the minor defendant asserted that, because he had not been found guilty of an offense that required adult prosecution under the Act, the statute mandated that his criminal conviction be vacated and that he be adjudicated a delinquent minor. See *Brazee II*, 333 Ill. App. 3d at 45-46. The State opposed this argument, asserting that the defendant stood convicted of a criminal offense, even

though he was required to be sentenced as a juvenile. See *Brazee II*, 333 Ill. App. 3d at 45-46. Considering the applicable statutory language and the purpose of delinquency hearings, the court resolved the issue in favor of the defendant. *Brazee II*, 333 Ill. App. 3d at 47-48. In particular, the court construed that portion of the statute which stated that a conviction of an offense not covered by section 5—130(1)(a) "shall not invalidate the verdict or the prosecution of the minor under the criminal laws of the State." *Brazee II*, 333 Ill. App. 3d at 46-47. The court concluded that "when the charge or charges enumerated in section [5—130(1)(a)] have been resolved in the minor's favor, he or she is no longer excluded from the definition of 'delinquent minor.' " *Brazee II*, 333 Ill. App. 3d at 48. The court further concluded that, "by validating the criminal prosecution and verdict, section [5—130(1)(a)] merely eliminates the need to retry the defendant in a formal delinquency hearing." *Brazee II*, 333 Ill. App. 3d at 48. In light of the decision in *Brazee II*, we agree with the defendant that his criminal conviction for second degree murder must be vacated, and he should be adjudicated a delinquent minor.

Based on the foregoing analysis, we vacate the defendant's conviction and sentence for second degree murder and remand the cause to the trial court with directions to enter an adjudication of delinquency. However, we note that the commitment of a minor under the Act terminates automatically upon his twenty-first birthday. See 705 ILCS 405/5—750(3), 5—755(1) (West 2006). The record demonstrates that the defendant was born on February 5, 1988, and that the offense was committed on May 11, 2004, when the defendant was 16 years old. Defendant is now over the age of 21 and is no longer eligible to be committed as a juvenile under the Act. Accordingly, the trial court is further directed to enter an order sentencing the defendant under the Act to time served as of February 5, 2009, the date of his twenty-first birthday. See *Mathis*, 357 Ill. App. 3d at 56-57; *Champ*, 329 Ill. App. 3d at 136.

Conviction and sentence vacated; cause remanded with directions.

KARNEZIS, P.J., and CUNNINGHAM, J., concur.