# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re M.I.*, 2011 IL App (1st) 100865

---

| | |
|---|---|
| Appellate Court Caption | *In re* M.I., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. M.I., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-0865 |
| Filed | December 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent was properly found guilty beyond a reasonable doubt of aggravated discharge of a firearm and unlawful use of a weapon in an extended jurisdiction juvenile prosecution arising from a gang-related fight, and respondent's adult sentence was not rendered void by the trial court's failure to conduct a hearing on the State's motion for an extended jurisdiction juvenile prosecution within the 30- or 60-day requirement under section 5-810 of the Juvenile Court Act, because section 5-810 is directory, not mandatory, and further, since respondent's adult sentence was stayed pending his completion of his juvenile sentence and the adult sentence had not been revoked, any damage was speculative and respondent lacked standing to argue that section 5-810 was unconstitutionally vague. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-JD-1621; the Hon. Paul Stralka and the Hon. Terrence V. Sharkey, Judges, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal Michael J. Pelletier, Alan D. Goldberg, and Emily E. Filpi, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People.

Panel JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion.

## OPINION

¶ 1 Respondent M.I. was adjudicated delinquent after the trial court found respondent guilty of three counts of aggravated discharge of a firearm and two counts of aggravated unlawful use of a weapon. Prior to trial, the State moved to designate the case as an extended jurisdiction juvenile (EJJ) prosecution, which the trial court allowed. The trial court sentenced respondent to an indeterminate term in the Juvenile Department of Corrections, which shall be no later than his twenty-first birthday, and pursuant to the EJJ statute, respondent received an adult sentence of 23 years in the Department of Corrections to be stayed pending respondent's successful completion of his juvenile sentence.

¶ 2 Respondent appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court failed to conduct a hearing on the State's EJJ motion within the 30- or 60-day requirement under the statute, making his adult sentence void; and (3) the EJJ statue is unconstitutionally vague because it does not provide fair warning of the prohibited conduct that triggers imposition of the adult sentence.

¶ 3 On April 23, 2009, respondent was arrested and charged by a petition for adjudication of wardship with three counts of aggravated discharge of a firearm, reckless discharge of a firearm, aggravated unlawful use of a weapon, and unlawful possession of a firearm.

¶ 4 On May 5, 2009, the State filed a motion to designate the proceedings as an EJJ, pursuant to section 5-810 of the Juvenile Court Act of 1987 (705 ILCS 405/5-810 (West 2008)). Section 5-810 allows the State to file a petition when a juvenile has been charged with an offense that would be a felony if committed by an adult, and upon a finding of guilty, the trial court shall impose a juvenile sentence and an adult sentence, which is stayed on the condition that the offender not violate the provisions of the juvenile sentence. 705 ILCS 405/5-810 (West 2008). The motion was set for a hearing on June 22, 2009.

¶ 5 On June 22, 2009, the State answered not ready for the EJJ hearing because it was "still waiting for some school records." A new attorney also filed an appearance for respondent and his prior counsel asked leave to withdraw. The proceedings were continued until July 6,

2009, for status. On July 6, 2009, the parties and the trial court agreed to conduct the hearing on August 12, 2009. The trial judge noted that, "this is way past the 60 days this was filed. But in many cases, the State's Attorneys advise me that's not mandatory." The judge asked the assistant State's Attorney if that was her position, and she responded that it was. The EJJ hearing was conducted on August 12, 2009, and the trial court granted the State's motion to proceed under the EJJ statute on September 1, 2009.

¶ 6        The following evidence was admitted at respondent's December 2009 bench trial. The trial judge presiding over the bench trial was a different judge than the judge who ruled on the State's EJJ motion.

¶ 7        Officer Kevin Kelly testified that on April 23, 2009, he was assigned to the gang enforcement section of the Chicago police department. At approximately 5:47 p.m. that evening, Officer Kelly was working with partners Officer Mulkerrin, Officer McDonough, and Sergeant Mason in the alley at Chicago and Mayfield in Chicago.[1] They were dressed in plain clothes. Officer Kelly stated that he was wearing his vest under his T-shirt and had his badge hanging around his neck. The officers had received a few calls of a gang disturbance. The officers were on foot conducting field interviews when they heard a lot of noise coming from Mayfield, to the west of their position. Their unmarked police car was parked in the alley, east of Mayfield.

¶ 8        Officer Kelly stepped out of the alley and observed a large group of black males beginning to fight. He estimated 30 or 40 men. He observed one man with a baseball bat about to strike another individual when he screamed, "Police, stop, stop, stop." The man with the bat responded, "F*** that, they got guns." The officer asked who had guns and the man answered, "Dude in blue." Officer Kelly testified that right after that statement, he heard two gunshots. Officer Kelly then ran back to the sidewalk and took cover behind a van. He described that van as green or blue teal with stripes. He looked up and "saw a male black in a blue jacket firing a gun three or four more times in [his] direction." Officer Kelly identified respondent in court as the person he saw firing the gun.

¶ 9        Officer Kelly stated that he saw respondent standing on the curb and pointing a gun in his direction. He further testified that as he heard the shots, he saw that respondent's "hand was recoiling," meaning "his hand was going up and down" as he was shooting. Officer Kelly estimated that he was approximately 30 feet or 3 car lengths from respondent during the shooting. Officer Kelly went to pull his weapon and respondent turned and started to run. Officer Kelly stated that his partners were behind him. He said that individuals were running in all directions, but his focus was on the man who was shooting the gun at him. When the respondent began to run, Officer Kelly gave chase.

¶ 10        When he started to run, Officer Kelly went to put his gun away and realized he had dropped it. He turned his head "for a second" or "half second" and his partner said he had Officer Kelly's gun. He was still able to see respondent after he turned his head. Officer Kelly continued running and shouted that it was the man with the blue jacket. Officer Kelly

[1]Officer Mulkerrin's name is also spelled "Mulkarin" and Officer McDonough's name is also spelled "McDunna" in the record.

testified that as they were running, three other men came up to respondent and it "looked like he was passing something off to them." The three other men split up in different directions while Officer Kelly continued to pursue respondent. Another police car cut off respondent and he was taken into custody. Officer Kelly stated that respondent was detained about a block away from the shooting.

¶ 11    Officer Kelly testified that he believed respondent was firing at him because respondent pointed the gun in his direction and he heard bullets hit things around him, including the van next to him.

¶ 12    On cross-examination, Officer Kelly stated that he could not see the gun when respondent began to run away. He said he thought respondent might have tried to put it in his jacket before the three other men came up beside respondent. Officer Kelly testified that he did not see respondent give the gun to someone else and he also did not see respondent put the gun in his coat. Officer Kelly admitted the arrest report did not state that respondent might have given the gun to another individual. He stated that he told the detectives and other officers about respondent passing the gun to another person. Officer Kelly said he did not see respondent throw the gun to the ground and the police searched in the general vicinity of where respondent ran, but did not recover a gun.

¶ 13    Sergeant Thomas Mason testified that on April 23, 2009, he was assigned to the gang enforcement section of the Chicago police department. Sergeant Mason stated that he was in civilian clothes with his bulletproof vest under his shirt and his badge displayed on his belt. While he was conducting field interviews with his partners, he observed a large number of young men engaged in a big street fight that appeared to be moving north on Mayfield. He and the other officers went to investigate. Sergeant Mason estimated that at least 30 men were participating in the fight. He saw one young man swinging a bat and he told him to stop.

¶ 14    At some point, Sergeant Mason was in the street speaking with some of the fight participants, including the man with the bat, who told the officers that someone had a gun. Sergeant Mason stated that the next thing that happened was that he heard a gunshot. He looked around and saw an individual standing on the corner on the opposite side of the street, less than 100 feet away, firing a gun. Sergeant Mason identified respondent in court as the person shooting the gun. He testified that he saw respondent firing a handgun "at what appeared to [him] to be right at [him] multiple times."

¶ 15    Sergeant Mason described the scene as "pretty chaotic" when the shots were fired, with people running in "every possible direction." Sergeant Mason began to chase after respondent and called on the police radio to report that shots had been fired. He said that respondent fled northbound and was very fast. He stated that another police car pulled near him and he told them who he was chasing. The officers sped up and were able to stop respondent. Sergeant Mason testified that he saw respondent in custody and he was the same person he had seen firing a gun. He further stated that he did not lose sight of respondent from the time the shots were fired until respondent was detained.

¶ 16    On cross-examination, Sergeant Mason testified that he did not see respondent hand the weapon to other individuals. He also did not see respondent discard the weapon. Sergeant

Mason admitted that he did not retrieve the weapon because it was not on respondent and he did not find it. He stated that the police looked "all along the path, along Mayfield, in the empty lots and along the parkway and street all the way out from where we saw him initially to point where he was arrested." Sergeant Mason said that later, Officer Kelly told Sergeant Mason that he believed he saw respondent hand off the gun.

¶ 17    Officer Fred Bojic testified that he was employed by the Chicago police department as an evidence technician. He stated that on April 23, 2009, he received an assignment to go to "745 Mayfield" in Chicago to collect evidence at a crime scene. He recovered three fired cartridge cases, metal fragments and a fired bullet. Officer Bojic testified that he recovered "one fired cartridge case stamped CCI 9-millimeter Luger" near the western edge of the sidewalk outside 758 North Mayfield. He also recovered a fired cartridge case "stamped CCI 9-millimeter Luger" under the bushes in a parking lot at 756 North Mayfield. The third fired cartridge case was recovered from the sidewalk at 756 North Mayfield. Officer Bojic also recovered a fired bullet from the lower front of the right front passenger door frame on a 1995 green Plymouth Voyager, parked at 749 North Mayfield.

¶ 18    Officer David Caldbeck testified that he was employed with the Chicago police department as an evidence technician. On April 23, 2009, Officer Caldbeck was assigned to go to Area 5 to perform a gunshot residue (GSR) exam on a suspect and to recover some clothing. He identified respondent as the suspect he performed the GSR exam on. He performed the GSR exam on respondent by dabbing with a little pad along the index finger and the thumb up the wrist of each hand. The pads were then sealed and placed into inventory. He also recovered respondent's blue leather jacket.

¶ 19    Officer Caldbeck stated on cross-examination that he did not know how much time had passed since the shooting until he performed the GSR exam on respondent. He said he saw respondent in the interview room with his hands cuffed separately to rings on the wall. Officer Caldbeck testified that the hands were kept apart to keep respondent from putting his hands together and intermingling the hands, which would have negated the exam.

¶ 20    Robert Berk testified that he was employed as a trace evidence analyst with the Illinois State Police forensic science center. He stated that he received the inventoried GSR test for analysis. After analyzing the GSR test, Berk found that the test was positive for the back of respondent's left hand, but negative for the right hand. These samples indicated to Berk that respondent "had either discharged a firearm, had contacted an item that had gunshot residue on it, or had his left hand in the environment of a firearm when it was discharged."

¶ 21    Following Berk's testimony, the State rested. Respondent moved for a directed finding. The trial court entered a directed finding for one of the aggravated unlawful use of a weapon charges because the State did not prove respondent guilty beyond a reasonable doubt of possessing a firearm without a firearm owner's identification card. The court denied the motion as to the remaining counts.

¶ 22    Respondent testified on his own behalf. He stated that at the time of trial he was 17. He said that on April 23, 2009, he went to Mayfield and Chicago to meet some friends because he heard there "was a commotion going on." His stepfather dropped him off. He denied having a weapon with him. He stated that he was at that location for about five minutes

before the police came. He testified that as soon as his stepfather left, he heard gunshots and everybody ran.

¶ 23    Respondent said he knew a couple of friends in the crowd. He stated that the fight was in the middle of the street. He denied seeing anyone with a bat or a bottle, but he saw some people with sticks. He denied being part of the argument. He was standing in front of a store at Mayfield and Chicago talking to someone. He said he did not leave until the shots were fired. He did not see the police arrive, but he saw "a police car by the alley." He knew it was a police car because it was a "Crown Vic" and he knew "how the police cars look." He did not see any police officers in the car.

¶ 24    Respondent testified that the gunshots were fired across the street from where he was standing, on the other side of Mayfield. Respondent stated that he did not know the shooter, but he had seen him before that day. He said he had "a juice" in his hands. After he heard the shots, he fled north on Mayfield to Iowa. As he ran, respondent denied giving something to someone and denied having a gun.

¶ 25    When he reached Iowa, respondent stated that the police were handcuffing a lot of people. He said the officers asked if he knew who was shooting and respondent answered that he did not. Respondent testified that his hands were cuffed behind his back and he was later placed in the police car. He said he was driven to the station by two female police officers. His hands were behind his back, but he stated that they were not touching anything and he denied rubbing his hands together. He denied having his hands cuffed separately to rings in an interview room. He said he was holding his mother's hand in the interview room. Respondent also denied that Officer Caldbeck was the officer who performed the GSR test on him.

¶ 26    On cross-examination, respondent said he went to that area to meet some friends from grammar school because of the fight. He testified that he knew his friends' first names, but did not know their last names or their addresses. He saw the police car in the alley and he testified that he knew what "undercover" police cars looked like. He stated that he did not see the police until after the shots were fired and the police began chasing everyone. Respondent rested after his testimony.

¶ 27    Following closing arguments, the trial court found respondent guilty of aggravated discharge of a firearm as to Officer Kelly, aggravated discharge of a firearm as to Sergeant Mason, aggravated discharge of a firearm in the direction of another person, reckless discharge of a firearm, aggravated unlawful use of a weapon for carrying a loaded, uncased and immediately accessible weapon on his person while not on his own land, and aggravated unlawful use of weapon for being under 21 years of age. At the hearing on respondent's motion for a new trial, the trial court vacated the conviction for reckless discharge of a firearm because the shooting could not be both reckless and intentional.

¶ 28    The trial court merged the third count of aggravated discharge of a firearm into the first count and also merged the two counts of aggravated unlawful use of a weapon into the first aggravated discharge of a firearm conviction. At sentencing, the trial court sentenced respondent to an indeterminate period of time in the juvenile division of the Illinois Department of Corrections, which shall be no later than his twenty-first birthday. The court

also sentenced respondent to an adult sentence of 23 years' in prison, which was to be imposed only if respondent failed to successfully complete his juvenile sentence.

¶ 29    This appeal followed.

¶ 30    Respondent first argues on appeal that the State failed to prove him guilty beyond a reasonable doubt. Specifically, respondent contends that the evidence was insufficient to prove that he committed the offenses because the police officers testified that they saw respondent fire the gunshots and never lost sight of him, but they failed to recover the firearm. Respondent also asserts that the results of the GSR test were suspect because there was no evidence that his hands were bagged or how much time had passed before the test was performed. The State maintains that the evidence was sufficient to establish the essential elements of respondent's conviction beyond a reasonable doubt.

¶ 31    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 32    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280. However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so. Reasonable people may on occasion act unreasonably. Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Cunningham*, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 33    The majority of respondent's argument concerns the failure to recover the firearm used in the shooting and the alleged unreliability of the GSR test. Respondent asserts that the evidence is insufficient to establish that he possessed a firearm because the testimony of Officer Kelly and Sergeant Mason was unbelievable. Respondent points to the officers' testimony that they each testified that they saw respondent fire a gun in their direction, did not lose sight when respondent fled the scene, and did not see him discard a weapon, but when respondent was detained, no weapon was found. Respondent argues that this testimony is implausible and it is unbelievable that he possessed a gun. Respondent also contends that Officer Kelly's testimony that he believed respondent handed the gun to one of the three men who ran up to respondent was conjecture and cannot form the basis of his conviction because this observation was not included in the police reports and Officer Kelly did not actually see

respondent hand the gun to another person.

¶ 34    Respondent further asserts that the results of the GSR test were suspect because the positive result could have resulted from the transfer of particles in the squad car or the interview room. Respondent cites to an FBI report as support, but this report was not presented to the trial court and we will not consider it on appeal.

¶ 35    Nevertheless, after viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to prove respondent guilty of aggravated discharge of a firearm. To sustain a conviction for aggravated discharge of a firearm, the State must prove that respondent knowingly or intentionally discharged a firearm in the direction of a person he knew to be a peace officer engaged in the execution of his official duties. 720 ILCS 5/24-1.2(a)(3) (West 2008). The State sufficiently established each element beyond a reasonable doubt.

¶ 36    Both Officer Kelly and Sergeant Mason testified that they were engaged in field interviews when they heard the commotion of a large fight on Mayfield. Both officers were in plain clothes with Officer Kelly wearing his badge around his neck and Sergeant Mason wearing his on his belt. Officer Kelly stated that he shouted "stop" and "police" when he saw a man with baseball bat. Officer Kelly heard that someone had a gun, a "dude in blue." Officer Kelly heard two shots and took cover next to a green van. When he looked in the direction of the shooting, he saw respondent with a gun. Officer Kelly testified that respondent was approximately 30 feet from him and he identified respondent in court. Officer Kelly described how he saw the gun recoil after respondent fired the weapon. Officer Kelly further stated that respondent fired the gun three or four times in his direction. A bullet from the gun struck the van that the officer was using for cover.

¶ 37    Officer Kelly also testified that he saw respondent turn to flee the scene. He lost sight of respondent for a "second" or "half second" when he dropped his gun, but he stated that he regained sight of respondent and began to chase him. While respondent was running north on Mayfield, Officer Kelly observed three males run beside him and he believed respondent passed the gun to one of those men. The men split off in different directions, but the officer continued to follow respondent. Officer Kelly admitted that this detail was not included in the police report and that he did not see the gun change hands, but these facts were raised in the trial court and went to the weight of the testimony. Officer Kelly was present when respondent was taken into custody.

¶ 38    Similarly, Sergeant Mason testified that he was in the street, trying to break up the fight, when he heard someone say that an individual had a gun. He heard two shots and looked around the scene. He saw respondent standing less than 100 feet away and firing a gun. He identified respondent in court. When respondent ran from the scene, Sergeant Mason also chased him.

¶ 39    Further, Officer Caldbeck testified that when he administered the GSR test, respondent was in an interview room with his hands cuffed separately to rings on the wall to prevent any contamination. Berk testified that he analyzed the GSR test and the test was positive for GSR on respondent's left hand.

¶ 40    In contrast, defendant testified at trial that he went to Chicago and Mayfield because he

heard of a fight and only arrived five minutes before the police. He stated that he was on the opposite corner from the shooter. He denied having a gun that day. Respondent said that he ran north and was detained along with several other people. He stated that his hands were cuffed behind his back, but that they did not touch anything. He denied having his hands cuffed to the wall and instead said he held his mother's hand in the interview room. He also testified that Officer Caldbeck was not the officer who performed the GSR test.

¶ 41　　The trial judge, as the fact finder, heard all the evidence in the case and found that the State had satisfied its burden of proof. In his findings, the judge gave a detailed description of the evidence presented in the case. The judge specifically stated that he chose "to believe some of [respondent's] testimony. I choose to believe he testified he was there. And I'm certain he was there. I also choose to believe that he saw a policeman with a badge and a gun and he knew he was the police. *** But that is about as much as I'm willing to believe from [respondent.]"

¶ 42　　The trial judge continued.

"I find the fact there is nothing in the reports. I've taken into consideration the three guys approaching. And I understand in an ideal world these individuals would have been listed in the reports. They're not. I don't give that much weight. I get to choose the weight I give the testimony and the witnesses. I find both Sergeant Mason and PO Kelly to be very, very credible. I find the minor to not be credible at all."

¶ 43　　Based on this evidence, a rational trier of fact could have found respondent guilty. The officers' testimony was not so improbable or unsatisfactory to create a reasonable doubt of defendant's guilt. The State was not required to recover the firearm in order to prove aggravated discharge of a firearm under section 24-1.2(a)(3). The State established that respondent knowingly or intentionally discharged a firearm in the direction of a peace officer engaged in official duties. Accordingly, we find that respondent was proven guilty of aggravated discharge of a firearm beyond a reasonable doubt.

¶ 44　　Next, respondent contends that the trial court did not have the authority to designate his case EJJ and impose an adult sentence because the hearing on the State's motion to designate the proceeding an EJJ case did not occur within 30 or 60 days of its filing. Specifically, respondent asserts that section 5-810(2) of the Juvenile Court Act is mandatory and the trial court was without jurisdiction to impose a stayed adult sentence because the hearing was not held within the stated period of time. Therefore, respondent argues, the sentencing order was void. The State maintains that the statute is directory and the delayed hearing was valid; thus, respondent's the EJJ designation and stayed adult sentence are proper.

¶ 45　　Although we agree with respondent that a hearing must take place before the EJJ designation can occur, the appropriate question is what the consequences are by failing to conduct a hearing within the 30- to 60-day time frame. In order to answer that question, we must address whether section 5-810(2) is mandatory or directory. *People v. Robinson*, 217 Ill. 2d 43, 54 (2005). Section 5-810(2) provides:

"The State's Attorney may file a written motion for a proceeding to be designated as an extended juvenile jurisdiction prior to commencement of trial. Notice of the motion shall be in compliance with Section 5-530. When the State's Attorney files a written motion

that a proceeding be designated an extended jurisdiction juvenile prosecution, the court shall commence a hearing within 30 days of the filing of the motion for designation, unless good cause is shown by the prosecution or the minor as to why the hearing could not be held within this time period. If the court finds good cause has been demonstrated, then the hearing shall be held within 60 days of the filing of the motion. The hearings shall be open to the public unless the judge finds that the hearing should be closed for the protection of any party, victim or witness. If the Juvenile Judge assigned to hear and determine a motion to designate an extended jurisdiction juvenile prosecution determines that there is probable cause to believe that the allegations in the petition and motion are true the court shall grant the motion for designation. Information used by the court in its findings or stated in or offered in connection with this Section may be by way of proffer based on reliable information offered by the State or the minor. All evidence shall be admissible if it is relevant and reliable regardless of whether it would be admissible under the rules of evidence." 705 ILCS 405/5-810(2) (West 2008).

¶ 46 "Whether a statutory command is mandatory or directory is a question of statutory construction, which we review *de novo*." *Robinson*, 217 Ill. 2d at 54. "The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006). "The best evidence of legislative intent is the language of the statute, and when possible, the court should interpret the language of a statute according to its plain and ordinary meaning." *In re Donald A.G.*, 221 Ill. 2d at 246.

¶ 47 "A mandatory provision and a directory provision are both couched in obligatory language, but they differ in that noncompliance with a mandatory provision vitiates the governmental action, whereas noncompliance with a directory provision has no such effect." *People v. Four Thousand Eight Hundred Fifty Dollars ($4,850) United States Currency*, 2011 IL App (4th) 100528, ¶ 24. The designation of a statute as mandatory or directory " 'simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' " *Robinson*, 217 Ill. 2d at 51-52 (quoting *Morris v. County of Marin*, 559 P.2d 606, 610-11 (Cal. 1977)). The supreme court in *Robinson* clarified that "whenever, as in this case, the mandatory-directory dichotomy is at issue the word 'shall' is not determinative." *Robinson*, 217 Ill. 2d at 54. Statutes are mandatory when the legislative intent dictates a particular consequence for failure to comply with the provision. *People v. Delvillar*, 235 Ill. 2d 507, 514-15 (2009). "In the absence of such intent the statute is directory and no particular consequence flows from noncompliance. That is not to say, however, that there are no consequences. A directory reading acknowledges only that no specific consequence is triggered by the failure to comply with the statute." (Emphasis omitted.) *Delvillar*, 235 Ill. 2d at 515.

¶ 48 The supreme court has held that "we presume that language issuing a procedural command to a government official indicates an intent that the statute is directory." *Delvillar*, 235 Ill. 2d at 517. This presumption may be overcome by either of two conditions to show that provision is mandatory: first, "when there is negative language prohibiting further action in the case of noncompliance," or second, "when the right the provision is designed to protect would generally be injured under a directory reading." *Delvillar*, 235 Ill. 2d at 517 (citing

*Robinson*, 217 Ill. 2d at 58).

¶ 49    In *Robinson*, the supreme court concluded that section 122-2.1(a)(2) of the Post-Conviction Hearing Act, which stated that a dismissal order "shall be served upon the petitioner by certified mail within 10 days of its entry" (725 ILCS 5/122-2.1(a)(2) (West 2000)), was directory. In reaching this conclusion, the supreme court found that the statute did not contain any negative language indicating that the dismissal was not effective or no dismissal would occur unless the defendant was served within 10 days. *Robinson*, 217 Ill. 2d at 58. As to the second condition, the court noted that the right being protected was the right to appeal, but found that a violation of the 10-day service requirement was "not so likely to prejudice the right to appeal as to require an exception to the general rule that procedural commands to government officials are directory." *Robinson*, 217 Ill. 2d at 57.

¶ 50    The supreme court in *Delvillar* considered section 113-8 of the Code of Criminal Procedure of 1963 (725 ILCS 5/113-8 (West 2006)), holding that the statute was directory. *Delvillar*, 235 Ill. 2d at 519. Section 113-8 states that before the acceptance of a guilty plea, the trial court "shall" advise the defendant in open court that if the defendant is not a citizen of the United States, the conviction could result in deportation, exclusion from admission to the United States or the denial of naturalization. 725 ILCS 5/113-8 (West 2006). The *Delvillar* court found that the provision did not include any negative language prohibiting further action. *Delvillar*, 235 Ill. 2d at 518. The court held that the right being protected was the right of a defendant to intelligently waive a jury trial and enter a guilty plea by informing the defendant of potential immigration consequences, but ultimately concluded that a defendant's right to waive a jury trial and plead guilty "will not necessarily be harmed in the absence of the admonishment." *Delvillar*, 235 Ill. 2d at 519.

¶ 51    In the instant case, section 5-810(2) provides that the trial court "shall" conduct a hearing on the State's motion to designate the proceeding as EJJ within 30 days of filing, or if good cause has been shown, the hearing "shall" be held within 60 days of filing. 705 ILCS 405/5-810(2) (West 2008). This provision does not contain any negative language. The statute does not prohibit the trial court from conducting a hearing on the State's motion if the 30- or 60-day time frame has passed nor does it provide for a result, such as, a dismissal of the State's motion, if a hearing occurs after the designated time frame.

¶ 52    As to the second condition, we first determine the right being protected by the statute. The right to be protected here is the right of a minor respondent to receive a hearing before being subject to an EJJ proceeding and a stayed adult sentence. The failure to hold an EJJ designation hearing within the prescribed time frame does not infringe upon this right and the minor will not be harmed by the delay. Under section 5-810(2), the State may file this motion anytime before the beginning of the minor's trial, and the minor is entitled to notice and a hearing on the State's EJJ designation motion prior to trial, which occurred in this case. Further, respondent asserts that he has been prejudiced by the delay because his case was designated EJJ and he received a stayed adult sentence. However, respondent's assertion is not the proper measure of prejudice. Rather, prejudice is established if the delayed hearing caused a different result than if the hearing had been timely. Respondent has not shown how the result of the proceeding would have differed if the hearing had been conducted within the statutory time frame. We find that a violation of the 30- or 60-day time frame for an EJJ

-11-

designation hearing is not so likely to prejudice the minor's right to the hearing as to require an exception to the general rule that procedural commands to government officials are presumptively directory. Accordingly, we conclude that section 5-810(2) is directory and the failure to conduct a hearing on the State's EJJ designation motion did not vitiate the subsequent EJJ proceedings.

¶ 53   Respondent cited several cases in support of his argument that section 5-810(2) is mandatory. The cases cited, *People v. Jardon*, 393 Ill. App. 3d 725 (2009), *People v. Mathis*, 357 Ill. App. 3d 45 (2005), and *People v. Champ*, 329 Ill. App. 3d 127 (2002), did not consider section 5-810(2), but instead involved section 5-130(1)(c)(ii) of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(c)(ii) (West 2008)). Section 5-130(1)(c)(ii) provided that in cases where a minor was charged with certain felonies and automatically transferred to the criminal court, but was ultimately convicted of a charge not listed, the trial court "must" sentence the minor as a juvenile "unless" the State files a motion for the minor to be sentenced as an adult within 10 days after a verdict. 705 ILCS 405/5-130(1)(a), (1)(c)(ii) (West 2008). This statute clearly contains negative language and outlines a specific consequence as the failure to file a motion within the prescribed time frame, it eliminates the possibility of an adult sentence. Further, the statute uses the word "must" as compared to the use of "shall" in section 5-810(2). Moreover, the supreme court's decision in *People v. King*, 241 Ill. 2d 374, 381 (2011), pointed out that all three cases made an erroneous assumption in interpreting section 5-130(1)(a) and we question the cases continued vitality.

¶ 54   Finally, respondent argues that the EJJ statute is unconstitutionally vague because it does not provide fair warning of the conduct that is prohibited and it fails to provide adequate guidance to authorities called upon to enforce its provisions. Specifically, respondent contends that section 5-810(6) of the EJJ statute does not provide him with proper notice as to what actions will result in a violation of his juvenile sentence and revocation of the stay on his adult sentence. He also asserts that the statute does not provide the trial court with any guidelines or standards to determine a violation of his juvenile sentence.

¶ 55   The State responds that respondent lacks standing to challenge the statute because he has not suffered any injury as he has yet to have his adult sentence imposed, and may never have the adult sentence imposed.

¶ 56   Section 5-810(6) provides:

"When it appears that a minor convicted in an extended jurisdiction juvenile prosecution under subsection (1) has violated the conditions of his or her sentence, or is alleged to have committed a new offense upon the filing of a petition to revoke the stay, the court may, without notice, issue a warrant for the arrest of the minor. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a new offense, the court shall order execution of the previously imposed adult criminal sentence. After a hearing, if the court finds by a preponderance of the evidence that the minor committed a violation of his or her sentence other than by a new offense, the court may order execution of the previously imposed adult criminal sentence or may continue him or her on the existing juvenile sentence with or without modifying or enlarging the conditions. Upon revocation of the stay of the adult criminal sentence and imposition of that

-12-

sentence, the minor's extended jurisdiction juvenile status shall be terminated. The ongoing jurisdiction over the minor's case shall be assumed by the adult criminal court and juvenile court jurisdiction shall be terminated and a report of the imposition of the adult sentence shall be sent to the Department of State Police." 705 ILCS 405/5-810(6) (West 2008).

¶ 57 " 'The general rule is that courts will not consider the validity of a statutory provision unless the person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid.' " *In re J.W.*, 346 Ill. App. 3d 1, 13 (2004) (quoting *People v. Morgan*, 203 Ill. 2d 470, 482 (2003)). Our review of the constitutionality of a statute is limited to the extent required by a particular case and we will not go beyond what is necessary under the circumstances of the case. *In re J.W.*, 346 Ill. App. 3d at 13.

¶ 58 "The doctrine of standing is intended to insure that issues are raised and argued only by those parties with a real interest in the outcome of the controversy." *People v. Greco*, 204 Ill. 2d 400, 409 (2003). A party does not have standing to challenge the constitutionality of a statute unless he has sustained or is in danger of sustaining a direct injury as a result of its enforcement; otherwise the challenge requests an advisory opinion. *Flynn v. Ryan*, 199 Ill. 2d 430, 437-38 (2002); see *People v. Hill*, 199 Ill. 2d 440, 445 (2002) ("A defendant does not ordinarily have standing to challenge a statute as it might be applied to others in different circumstances."). "Standing is an element of justiciability, and it must be defined on a case-by-case basis." *Greco*, 204 Ill. 2d at 409.

¶ 59 In *In re J.W.*, this court already considered a constitutional challenge to section 5-810(6) and held that a claim challenging the revocation of the stay on vagueness grounds was premature and declined to consider the issue. *In re J.W.*, 346 Ill. App. 3d at 14. The court specifically noted that the respondent was not challenging the imposition of the adult sentence on constitutional grounds, but instead was challenging the revocation of the stay. *In re J.W.*, 346 Ill. App. 3d at 14. In reaching this conclusion, the reviewing court considered several cases in which a defendant challenged a mandatory parole provisions that occurred after revocation of parole. The *J.W.* court noted that in those cases, the defendants' constitutional challenges were premature because no injury had occurred and the appeal would not be ripe until the parole had been revoked. *In re J.W.*, 346 Ill. App. 3d at 14-15 (citing *People v. Wills*, 61 Ill. 2d 105, 108 (1975), *People v. Mengedoht*, 31 Ill. App. 3d 1084, 1086 (1975), and *People v. Therriault*, 42 Ill. App. 3d 876, 890 (1976)).

¶ 60 Respondent contends that the holding in *In re J.W.* is in conflict with the decision in *In re Matthew M.*, 335 Ill. App. 3d 276 (2002). We disagree. In *In re Matthew M.*, the respondent challenged the imposition of his EJJ sentence as a violation of due process under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because section 5-810 allowed the trial court to increase the maximum sentence based upon the presence of certain factors that were not submitted to a jury and proved beyond a reasonable doubt. *In re Matthew M.*, 335 Ill. App. 3d at 286. The State asserted that this challenge was not ripe until the adult sentence was imposed. The reviewing court disagreed, finding that it had all the relevant facts presented and the harm to the respondent was clearly known. *In re Matthew M.*, 335 Ill. App. 3d at 288.

¶ 61     In contrast, the harm to respondent is not clearly known because no violation of section 5-810(6) has been alleged. The respondent in *In re Matthew M.* challenged the imposition of the stayed adult sentence as a constitutional violation, but here, respondent has challenged the revocation of the stay. Since the stay of respondent's adult sentence has not been revoked, respondent's claimed damage is speculative. Accordingly, respondent lacks standing to raise this constitutional challenge and we will not consider it.

¶ 62     Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 63     Affirmed.